## HILLARD v. REMINGTON TYPEWRITER CO.

(Circuit Court of Appeals, Second Circuit.   March 13, 1911.)

### No. 131.

1. PATENTS (§ 112*)—SUITS FOR INFRINGEMENT—EFFECT OF INTERFERENCE PROCEEDINGS.

The question in interference proceedings in the Patent Office is as to which of the contestants was the prior inventor, invention being conceded; and in subsequent litigation the unsuccessful party is not estopped to deny invention, or even priority of invention, although there is a strong presumption that the successful contestant was the prior inventor, which can only be overcome by clear and convincing proof.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

2. PATENTS (§ 328*) — INFRINGEMENT — LINE-LOCK MECHANISM FOR TYPEWRITERS.

The Hillard patent, No. 791,420, for improvements in typewriting machines, claims 8, 11, 12, and 15, which relate to means for releasing the line-lock, if conceded to involve invention, cover specific improvements only on the existing art, and must be limited to the improvements described. As so limited, they are not infringed by the devices of the Webb patents, Nos. 599,428 and 618,154.

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Frederic W. Hillard against the Remington Typewriter Company. From a decree holding valid and infringed claims numbered 8, 11, 12, and 15 of letters patent No. 791,420, granted to Frederic W. Hillard for improvements in typewriting machines, defendant appeals.   Reversed.

Frederick P. Fish, H. D. Donnelly, and W. W. Dodge, for appellant.

Kerr, Page, Cooper & Hayward (Thomas B. Kerr and John C. Kerr, of counsel), for appellee.

Before COXE, WARD, and NOYES, Circuit Judges.

COXE, Circuit Judge. The patent in controversy was granted May 30, 1905, for an improvement in typewriters. It relates to line-locks, or, in other words, to the mechanism whereby the keys are automatically locked, at a predetermined point in the line of print, to notify the operator of the approach of the end of the line and thus prevent him from printing the letters one over the other at that point.

The claims in question relate to the second of the improvements described in the patent, viz., the means for releasing the line-lock. The line-lock lever is mounted at the extreme left of the rack bar, as shown in Fig. 1, and can be vibrated up and down upon the stud on which it is pivoted. The longer and heavier arm of this lever constitutes the line-lock stop which is prevented from dropping down, and is held in normal position by a pin. When the carriage has been advanced sufficiently to bring the stop into the obstructive position which prevents further writing, by pressing down the key, which is the shorter and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

lighter end of the lever, the longer end is raised above the arm on the rocker frame and writing can be resumed. To accomplish this result would seem to be an exceedingly simple mechanical problem. A lever is pivoted so that one end is longer than the other. Naturally the heavy end falls and the light end rises. If it be desired to raise the heavy end two ways of accomplishing this result would suggest themselves to the mechanic: First, to elevate the long end; and, second, to depress the short end. The second would be the simpler method and, if the operation were to be frequently repeated, it would be advantageous to form the short end into a key. Once given the lever and the necessity for raising the heavy end, the means for accomplishing the desired result would occur to the veriest tyro in mechanics.

As this lever is at the rear of the machine and not easily reached or seen by the operator, the patentee has provided what he calls "a more convenient means for tilting the line-lock stop out of its obstructive position to unlock the type keys." For this purpose he has provided at the left hand end of the top bank of keys an independent release key which, by a train of connecting mechanism, pushes up the heavy end of the line-lock lever when the release key is depressed by the finger of the operator. In the one case the line-lock lever is raised by pressing down its short end and in the other it is raised by pressing up its long end. In the first instance the finger of the operator falls directly on the key mounted on the short end of the lever itself and in the second it falls on a key in the keyboard which by a simple arrangement of connecting levers lifts up the long end of the line-lock lever.

The specification describes and shows the independent key, which is a key having an operative connection with the line-lock when the latter is in its obstructive position and means operated by the key for independently moving the line-lock out of its obstructive position. The patentee states that prior to his application means for unlocking the line-lock were in use, but such mechanism did not include an independent key. The specification concedes that in one of the prior structures the key which shifts the carriage from lower to upper case may be utilized to unlock the line-lock, but it is contended that the carriage shifting key is not an independent key. The principal advantage of the patented key is alleged to be that it performs its office without the performance of any other essential function and is thus more correct and accurate. The patented key is one which, when performing its function of a line-lock releaser, is incapable of performing any other function in the operation of writing and consists in certain novel features of construction of the key which are not limited to any particular form of line-lock. The drawings show two examples of release keys, one mounted on the carriage and the other on the keyboard. It is unnecessary to analyze all the claims in issue. Claim 8 is as follows:

"In a typewriter line-dock the combination of two stops, one of which is mounted in the escapement and movable therewith and the other of which is moved with the carriage into position to obstruct the escapement-stop, a key, a line-lock releaser, and a connection between the key and the line-lock releaser whereby the releaser is controlled by the key substantially as described."

The claim consists in a typewriter line-lock of a combination having the following elements: First: A stop, mounted in the escapement and movable therewith. Second: A stop moved with the carriage into a position to obstruct the escapement stop. Third: A key. Fourth: A line-lock releaser. Fifth: Connection between the key and the releaser for controlling the releaser by the key.

Claim 15 is substantially similar to claim 8.

Claim 11 is as follows:

"In a typewriter, the combination with a power-driven carriage, of a power-driven stop and a key-driven stop, brought into obstructive position with each other on the movement of the carriage, an independent key normally free from the carriage and means controlled thereby for positively removing the power-driven stop from its obstructive position, substantially as described."

The claim contains the following elements in a typewriter combination: First: A power-driven stop and a key-driven stop brought into obstructive position with each other, on the movement of the carriage. Second: An independent key normally free from the carriage. Third: Means controlled by the key for positively removing the power-driven stop from its obstructive position.

Claim 12 is substantially similar to claim 11.

The defenses are lack of novelty and invention and noninfringement. Much was said in the Circuit Court and in this court, both in the briefs and orally, regarding the Brooks-Hillard interference, which was finally decided in favor of the latter. We do not understand, however, that it has any important bearing upon the present issues.

It was decided by the Circuit Court that no privity was legally established between Brooks and this defendant and the complainant expressly states in his brief as follows:

"But we have not and do not now claim estoppel by reason of the facts proven; only that they are persuasive of invention, and, as against the defendant, greatly increase the presumption of the same created by the grant of the patent."

And again:

"We make no claim to estoppel. It is well settled that the defeated party to an interference has the right to contest in the courts not only the question of invention, but even that of priority of invention."

[1] We so understand the law. The question in interference proceedings is which of the contestants was the prior inventor. The question of invention is not involved and is in fact conceded. Each party contends for the prize of being declared the first inventor. No one, with the ordinary brain development, would offer proof to destroy his adversary's claims and his own as well. Both believe an invention has been made; each claims to be the inventor and when the decision is finally made it carries a strong presumption in favor of the successful party. As between Brooks and his privies and Hillard, the latter is to be deemed the prior inventor until that presumption is overcome by clear and convincing proof. Morgan v. Daniels, 153 U. S. 120, 14 Sup. Ct. 772, 38 L. Ed. 657. We see no reason why the defendant may not avail itself fully of the defenses of lack of invention and non-infringement.

Hillard's application was filed January 9, 1893; no earlier date of invention has been shown. In May, 1892, a patent was granted to Clinton & McNamara showing a line-lock and releaser for accomplishing the same result as in the patent in suit. The line-lock is released by pushing one end of a lever and thus removing the hook at the other end from obstructive engagement with the stop.

Williams patent No. 501,753 shows a line-lock which arrests the movement of the keys when the carriage is at or near the end of its movement. The line-lock is released by a rocking key which disconnects the parts and unlocks the lock.

W. S. Cress also obtained a patent in 1893 on an application filed June 8, 1892. He says:

"Another object of the invention is to provide an improved attachment for typewriting machines which will stop the operation of the key levers when a proper number of words has been written upon a line."

The attachment was applied to a Caligraph typewriter, but the patentee says:

"When a word, or a portion of a word is to be added at the end of a line, the attachment may be readily manipulated in a manner to admit of the insertion of such matter. The attachment is capable of application to any machine, the principal operative parts being adjustable."

To release the line-lock Cress has a key at the front of the machine connected by mechanism to a locking bar. When the key is pressed down the bar is rocked into a horizontal position and the key levers are unlocked. Other instances might be cited where, prior to Hillard, devices intended to release the line-lock are described and shown, but in our view it is unnecessary to multiply these examples. The record proves beyond question that prior to the earliest date which can be assigned to Hillard's alleged invention, line-locks and lock releasers were well known. Indeed, the line-lock could not be used without the releaser. A lock implies a key and no lock is useful without some means for unlocking it. All the prior inventors understood this, of course, and each provided mechanism for releasing the line-lock. All accomplished the same result by means similar in principle but differing in detail; some of the differences being attributable to the character of the machine to which the devices were applied. Bearing in mind that the claims in controversy do not relate to the line-lock, but to the releaser, and that releasers were well known, the question for us to determine is—Did it require an exercise of the inventive faculties to produce the combinations of the claims, and, if so, can they, in view of the prior art, be construed to cover the defendant's construction?

In approaching this subject it is wise to disabuse the mind of the notion that an exceptionally high order of intellect is required because the improvements relate to typewriters. The Remington machines in evidence have a notice prominently printed thereon stating that "this machine is protected by 67 American and foreign patents." There is danger that the court in contemplating a machine so complicated and delicately organized may become imbued with the idea that no changes or additions can be made unless the party making them is possessed

of an extraordinary degree of ingenuity. Mechanical skill is not converted into invention because it is applied to a structure showing the highest degree of inventive genius. If the problem be to construct a key for a lock, it can make no difference whether the lock be attached to a typewriter or an ice box.

Turning now to the patent, the first form of releaser described is the key 25, which when depressed tilts the line-lock stop 24 above the arm 21. If the complainant's illustrative model, which is a Remington machine with the Hillard line-lock attached, correctly shows the patented devices, and it seems to do so, it is difficult to discover invention in the means employed for lifting the line-lock stop 24 above the arm 21. A neophyte would see at a glance that the arm 21 will not rock until the end of the lever at the right of the fulcrum is lifted up. As before stated, there are but two ways of doing this, both of them perfectly obvious—one is to push up the obstructing end, the other is to press down the opposite end. Given the line-lock and the necessity for opening it, we are unable to see how one who adopts the only possible methods of doing this can be regarded as an inventor. To form the short end of the lever into a key convenient for the finger of the operator was but an ordinary exhibition of mechanical skill. The other method of pushing up the long end of the lever by means of a key located in the keyboard is treated by the patentee, apparently, as an equivalent. He says, in substance, that it is "a more convenient means" for accomplishing the same result. If there be no invention in pressing down the short end of the lever, it is not easy to understand how there can be invention in pressing up the long end. In any event, we can see nothing patentable in moving the lever up or down by means of a key in the keyboard.

The problem is one which is continually presented where it is desirable to bring an operating part nearer to the hand of the operator. Similar expedients have been constantly resorted to. If a door be closed by a spring lock operated from the inside and the inmate of the room desires to open it to a visitor without rising from his desk, he naturally rigs up a connection by cords and pulleys and releases the lock by pulling on the cords. If it be desired to open or close a transom or a window which cannot be reached by hand, nothing is more common than the resort to pulleys and cords, cranks and levers. Such methods have been in vogue for years. The patentee conceived the idea that it would be more convenient to have the operating key located where it could be seen and reached by the operator while seated, and he therefore placed it in the keyboard connecting it by a well-known train of mechanism with the line-lock stop. It did not require an exercise of "the intuitive faculty of the mind" to do this. The writer had occasion to deal with a somewhat similar situation in Mann's Boudoir Car Co. v. Monarch Sleeping Car Co. (C. C.) 34 Fed. 130. See, also, Aron v. R. R. Co., 132 U. S. 84, 10 Sup. Ct. 24, 33 L. Ed. 272; Stephenson v. Brooklyn R. R. Co., 114 U. S. 149, 5 Sup. Ct. 777, 29 L. Ed. 58. If, however, the claims can be sustained at all it is clear, in view of the existing art, that it can only be for the mechanism described and shown—a broad construction is impossible. The most liberal view that can be taken of the claims is that they cover improve-

ments upon the then existing art. The defendant does not use these improvements.

The defendant's machines are built under patents granted to George B. Webb Nos. 599,428 and 618,154 and it is asserted that the alleged infringing devices have been in commercial use for 13 years. It is unnecessary to enter upon a minute description of the defendant's line-lock and release devices for the reason that they are exceedingly complicated and difficult to understand except in conjunction with the drawings or model. Some of the differences between the complainant's and defendant's structures are pointed out by Mr. Browne, the defendant's expert, as follows:

"In the defendant's machine, when the push knob is pressed in to rock the bar 28 and lift the obstructing stop 26 above the escapement stop to unlock the line the effect is to disconnect the pendant 33 from the ear 32 so that the pressure on the push knob can be immediately released and the further forward movement of the carriage can thereafter continue without there being any re-locking and without maintaining any further pressure on the push knob. This differs from the Hillard construction wherein the finger must be kept pressed on the key 27 (or key 25) during the further advance of the carriage."

"Defendant's releasing mechanism has accordingly important differences over the Hillard mechanism. Defendant's releaser and obstructing stop always maintain the same relation to each other and always move together; when the release has once been effected no further holding of the push knob 48 is necessary; and the restoration of the obstructing stop to its normal position is aided by a spring. On the other hand, in the Hillard mechanism the obstructing stop and releaser are independent, so that the stop moves independently of the releaser and is normally out of reach thereof; when the release has been effected the key 27 must be held down by the finger during any further forward movement of the carriage; and the restoration of the carriage or obstructing stop to its normal position is effected solely by gravity."

It thus sufficiently appears that the defendant does not use the Hillard devices, but a combination covered by patents owned by it which releases the line-lock, it is true, but by means essentially different and which are not covered by the claims in suit unless given a construction unwarranted by the prior art.

The decree of the Circuit Court is reversed with costs.