**CORLEY et al. v. ROBINSON.**

No. 285.

District Court, D. New Hampshire.
April 21, 1933.

J. Edward Flynn, of Concord, N. H., and Nathaniel Frucht, of Providence, R. I., for plaintiffs.

Emery, Booth, Varney & Townsend, and Lawrence G. Miller, all of Boston, Mass., and Donald Knowlton of Concord, N. H., for defendant.

MORRIS, District Judge.

This is a bill in equity, filed November 29, 1932, under the provisions of Revised Statutes, § 4915 (35 USCA § 63), to determine priority of invention with respect to a portable turret standpipe or water gun and appliances of the type used by fire departments in extinguishing fires.

On January 7, 1929, the defendant, Robinson, filed an application for a patent, No. 330,856. On March 5, 1929, the petitioner Corley filed an application, No. 344,338, for a patent covering practically the same appliance with minor differences. His rights were assigned to the J. M. Baker Pattern Company. Each of the applicants claimed invention of a water-gun device similar in construction. An interference between the two applications was declared April 4, 1930 (patent interference No. 59718). In the interference proceedings there were ten counts in issue between the parties, but counts 2 and 10 are said to be illustrative:

Count 2. "A portable turret standpipe for fire hose, including a horizontal tubular body including a member having inlet openings at one end and an elbow member at the other end for directing the flow of water through the body upwardly, a head swiveled on said elbow member and a nozzle mounted on said head, and a pair of support arms lying generally in the plane of the body and pivotally mounted on opposite sides of the standpipe to swing horizontally from a folded position lying along the body to an extended standpipe-supporting position at an angle to the body."

Count 10. "A water gun comprising a pipe having a horizontal portion terminating in an elbow, a monitor carried by said elbow, holding means positioned on each side of said elbow and adapted to vertically support a

pivot pin, pivot pins in said holding means, legs pivotally mounted on said pivot pins to swing horizontally thereon, and adapted selectively to lie adjacent said horizontal portion or swing outwardly therefrom substantially in the plane thereof to provide in cooperation with said horizontal portion a base considerable area whereby to support the monitor on the upstanding end of the elbow, and catches for retaining said legs in folded position."

The device in issue is so constructed that a stream of water may be played in any direction without moving the gun from a set position. Stability is accomplished by means of hinged legs so attached to the elbow of the gun that they can be opened out at right angles to the axis of the barrel of the gun, and when it is not in use, the legs can be swung to a position adjacent to the barrel of the gun and parallel to its longitudinal axis. The device is of a character to be readily carried by a fireman and, when positioned on the ground, needs no other support. Its stability is due to the fact that the folding legs when unfolded furnish a base broad enough to support the appliance, particularly as the action of the water passing through the elbow and so upward through the yoke and nozzle has a downward pressure.

The specific portions of the device in issue are the rounding elbow providing for a perpendicular attachment for the yoke and nozzle and the longitudinal folding legs to give the gun stability when placed on the ground.

The case was first heard by the Examiner of Interference, who awarded priority to Robinson. Corley appealed from the examiner's decision to the Board of Patent Appeals, which board on June 3, 1932, handed down an opinion sustaining the decision of the examiner. Thereupon Corley filed this bill in equity.

Whether or not the form of the elbow and leg attachments are of such form and character as to disclose invention is a question not involved in this proceeding.

The defendant relies in part upon newly discovered evidence. Other than newly discovered evidence and supporting depositions of numerous witnesses, the testimony offered before the court consists of a transcript of the oral testimony introduced before the examiner, the exhibits, the decision of the examiner, and the opinion of the Board of Appeals. The evidence used before the examiner and opinions were admitted by agreement of parties.

The law applicable to the issues involved in the case appears to be fairly well settled in this jurisdiction dating back to an opinion of Judge Putnam in the case of Greenwood et al. v. Dover et al. (C. C. A.) 194 F. 91, wherein it was held, following Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 38 L. Ed. 657, that the rule applicable to a suit in equity brought under the provisions of R. S. 4915 as amended, to obtain a patent which was awarded to another by the Court of Appeals of the District of Columbia in interference proceedings, is that such decision must be given weight in the nature of a departmental decision, and, to overcome it, the evidence must be of such character, and sufficient at least to require a clear conviction that it was erroneous. In the case of United Shoe Machinery Corp. v. Muther, 288 F. 283, 287, Judge Johnson, speaking for the Circuit Court of Appeals for the First Circuit, says: "The Commissioner of Patents is an administrative officer of the government, charged with the duty of administrating the patent laws of the United States, and the same presumption should be applied to his acts and decisions as to those of any other administrative officer to whom Congress has committed the administration of any law." For authorities in other jurisdictions, see Roth v. Harris (C. C. A.) 168 F. 279; Hillard v. Remington Typewriter Co. (C. C. A.) 186 F. 334; Novelty Glass Mfg. Co. v. Brookfield et al. (C. C. A.) 170 F. 946; Rousso v. Barber (C. C. A.) 3 F.(2d) 740; Gold v. Gold (C. C. A.) 237 F. 84; Uihlein v. General Electric Co. (C. C. A.) 47 F.(2d) 997.

In determining the question of priority of invention in interference proceedings, with respect to the weight to be given to the decision of administrative heads, the courts have used varying language. The language of Morgan v. Daniels is that there must be a clear conviction on the record that the conclusions of the Court of Appeals was erroneous. This language was adopted by Judge Putnam in Greenwood v. Dover, supra. In the case of Automatic Weighing Machine Co. v. Pneumatic Scale Corp. (C. C. A.) 166 F. 288, 304, Judge Colt of this circuit said: "Upon this question of fact the decision of the Patent Office tribunals and the Court of Appeals of the District of Columbia is entitled to great weight, if it is not absolutely controlling." Another court (Hillard v. Remington Typewriter Co. [C. C. A.] 186 F. 334, 336) says: "When the decision is finally made it carries a strong presumption in favor of the successful party." In another case

(Novelty Glass Mfg. Co. v. Brookfield [C. C. A.] 170 F. 946, 955) it is said: "The decision in the interference proceeding, which, while not conclusive, is for the defendants to overcome." In another case (Computing Scale Co. v. Standard Computing Scales Co. [C. C. A.] 195 F. 508, 515) it is said: "An interference award * * * should be adopted by the courts in subsequent litigation between the same parties unless there is thorough conviction to the contrary."

While the point has been expressed in different language, the conclusion reached, however phrased, is the same. We therefore conclude in the instant case that unless the evidence before the commissioner taken in connection with the new evidence so far satisfies the court that the decision of the Examiner of Interference affirmed by the Board of Appeals was clearly wrong, priority of invention must be awarded to Robinson. The burden of proof is upon the petitioner. Morgan v. Daniels, supra.

In the case of Automatic Weighing Machine Co. v. Pneumatic Scale Corp., supra, Judge Colt lays down the following rules for guidance in determining the question of priority: "When two patents for the same invention have been issued to independent inventors, * * * the dates of their respective inventions are, first, the dates of the patents; second, the dates of the applications, provided the application sufficiently describes the inventions; third, the dates of actual reduction to practice; fourth, the dates of conception; with this qualification, that, if either patentee seeks to carry the date of his invention back to the date of his conception, he must show reasonable diligence in adapting and perfecting his invention, either by actual reduction to practice or by filing his application." The court sees no reason why these suggestions are not as applicable to an interference proceeding as to a contest between rival patentees.

In approaching the sole question at issue in this case, viz., that of priority of invention, it seems proper to first consider the testimony introduced before the examiner in the interference proceedings to determine whether or not the ruling of the examiner concurred in by the Board of Appeals, awarding priority to Robinson, is so clearly wrong that the court ought to reach a different conclusion. If the determination of the administrative bodies is sustained, then it becomes the duty of the court to consider the additional evidence with respect to its bearing upon the original testimony with a view of determining whether such additional testimony so clearly elucidates controversial questions as to show that the earlier result is clearly wrong.

The Examiner of Interference has allowed Robinson the date of conception and reduction to practice as of October 13, 1928, and held that he was active from that date to January 7, 1929, the date of filing his application. The court understands that Corley concedes such dates.

By "reduction to practice" is meant the perfecting of something of practical use coupled with a constructive or conclusive demonstration by practical test that it is capable of producing a desired result. Curtiss Aeroplane & Motor Corp. v. Janin (C. C. A.) 278 F. 454. The date of conception and reduction to practice awarded to Robinson by the administrative board is amply supported by evidence.

The high points in Corley's evidence in the interference proceeding are that he conceived the invention in issue in 1924, and that he made the necessary layout boards between 1924 and 1926 from which patterns were made; that the first legs were made of bronze in 1925, cast for him by the Warwick Brass Foundry, Inc.; that he reduced his invention to practice on September 23, 1927, when his water gun was tested by the Providence Fire Department; and that he did not abandon or suppress his invention. As tending to corroborate Corley's testimony and establish his claims, he introduced in evidence layout boards on one of which appeared a diagram of a leg pattern and the words, "Laid out by J. T. Corley, Oct. 1924." One Soderberg, a factory worker, testified concerning shop work on leg patterns, and one Boyle, a shop foreman, testified that the layout boards were used to make the patterns, that castings were made from the patterns, and that the first successful pipe was assembled three or four years ago. Corley testified the first legs were made of bronze by the Warwick Brass Foundry, Inc., and delivered January 5, 1925. To corroborate this last statement the testimony of a Mr. Morgan connected with the Warwick foundry was to the effect that he remembered making a pair of bronze legs and trying unsuccessfully to make aluminum legs. Two invoices on billheads of the Warwick Company were introduced in evidence, marked Exhibits "J" and "K." The first one is dated January 5, 1925, and covers two bronze castings, 12 pounds at 30, $3.60. The other one, dated April 7, 1925, covers two aluminum castings, 3½ pounds at 80, $2.80. It is noted

that neither of these bills have been receipted, neither do they contain any marks to indicate they were the original bills. Exhibits J and K were before the examiner. Various time books of different employees of the J. M. Baker Pattern Company were introduced in evidence containing entries which it was claimed showed the time employed by factory men in perfecting the different parts. Even a casual examination of the time books introduced in evidence satisfies me that many of the entries have been changed. Erasures have been made and entries inserted between other entries written with a different pencil. When entries in books supposed to be kept in the regular course of business are changed subsequent to the original entries, it always creates a doubt of their genuineness and the truth of the ultimate facts for which they are offered in evidence. This criticism is particularly applicable to the entries in the time book of Arthur Soderberg under dates of October 6–15, November 24–30, 1926, and January 1, 1927. The same might be said of some of the entries in the plaintiff Corley's time book. The changed entries are such as appear to be particularly applicable to the claimed invention. There are other entries referring to work on turret pipes which appear regular but which do not by reference indicate their applicability to this particular turret pipe.

It appears that prior to making any application for this patent Corley invented and made application for a turret pipe which is marked "Exhibit U" in the present case. The pipe is illustrated in the red catalogue marked Robinson's Exhibit 8, being one of the J. M. Baker Pattern Co.'s catalogues. On page 9 and underneath the illustration are the words, "Showing model No. 3 as used on the ground holding itself without assistance." It will be noted that the barrel of the gun has short leg attachments.

Application for a patent on Exhibit U was made December 15, 1927, and was granted December 3, 1929, and I feel morally certain that many of the early time-book entries have reference to Corley's prior invention for which he received a patent. I cannot believe that the period from the first entries in October, 1924, down to September 25, 1927, were consumed in perfecting such simple contrivances as the two legs and an elbow barrel similar in shape to the elbow on an ordinary kitchen stove pipe. Corley's time was spent on something else.

Corley testified that he had trouble in securing a yoke casting from the Warwick Company, and finally turned the work over to the Darlington Brass Foundry, and that he secured from it the first successful yoke casting September 1, 1927. A receipted bill for the same was offered in evidence and marked "Exhibit M." The original yoke casting was marked "Exhibit N." He testified that this was the last casting made to complete the turret pipe parts. He identified it by a bad spot at the large opening, but he said it was good enough for a trial test. An inspection of the casting shows the words: "Baker's Universal Turret Standpipe, Prov. R. 1. Patented." By reference to Baker's catalogue No. 7, (Defendant's Exhibit 12), I find that Baker's Universal turret standpipe is prominently advertised as the "World's only transferable and self-holding turret standpipe for fighting fires of all kinds," but nowhere in the catalogue is there any illustration of a standpipe with elbow and legs of the type of Exhibit A and the name does not appear to have been first applied to a standpipe of that character. I am unable to find any date indicating when catalogue No. 7 was issued. As the yoke received from the Darlington Foundry Company appears to be the same as shown in Corley's patent 1,738,-421, (Exhibit U) I am not convinced that the yoke was intended for the present invention. Corley testified that after the yoke casting, Exhibit N was received, it was machined and threaded and made ready for assembling; that the work was done by an employee named Stearns; that he remembered that Stearns did this work in September, 1927, because it was the last work he did before leaving the employment of the Baker Company. Stearns' daybook was offered in evidence and marked "Exhibit O." The last two entries under date of September 16 and 17 are referred to as corroborating Corley's testimony. It is noted that the original items in the book between September 12 and 15 indicate work on a ladder. Plainly, the same word "ladder" was written opposite the date 16th but has been changed to read "turret pipe." After the date 17th the word "wagon" is written and there has been an effort to erase the same and the word "turret pipe" written in. Stearns has not been called as a witness. Plainly such manifest changes from the original entries creates more than a suspicion of the truth of the claim concerning which they are offered to substantiate.

As already indicated, the term "turret pipe," as used in the time books and Baker catalogue, appears to be applicable to Corley's patent, No. 1,738,421. As already indicated, the main features in which the turret pipe, Exhibit A, differs from patent No. 1,-

738,421 and other turret pipes of the Baker manufacture, consist in the hinged legs and the use of an elbow to connect the siamese and barrel with the yoke construction and any evidence or reference in time books which does not distinguish these elements from Exhibit U is inadequate to support the issues in the interference proceeding. It is such distinguishing entries that show erasures and other indicia of changes.

As tending to establish plaintiff's date of reduction to practice, namely, September 23, 1927, Corley testified that a test of his turret pipe, Exhibit A, complete with bronze legs, cast by the Warwick Brass Foundry Company from the patterns shown on layout board marked "Exhibit D" was made following a foamite test by the Providence Fire Department on September 23, 1927. For corroborative evidence establishing this date, a photostatic copy, Exhibit R, of the records of the Providence Fire Department was introduced showing that a foamite test was made on that date, but no mention whatever was made of a turret pipe test. Fire Chief Charlesworth of the Providence Fire Department testified that Corley asked him to make a test of Exhibit A following the foamite test; that the idea of the test was to demonstrate the folding legs on the pipe; that he personally supervised the test to determine its practicability; and that it demonstrated a practical construction of a turret pipe. Deputy Chief Fischer corroborated Chief Charlesworth with reference to this test. Charlesworth also testified to a test made January 31, 1928, which he says was also made with the idea of testing the folding legs. It is claimed that these legs with slight changes were cast from a pattern made from layout board Exhibit D. In addition to the date "Oct. 1924," there appears further writing on the board, viz., "Final leg pattern ———— John T. Corley, May 1926." Soderberg's time book contains entries of time spent on "leg patt" in October and November, 1926. The testimony tends to show that the first successful leg castings were delivered January 5, 1925, they being the only bronze castings made from layout D and the patterns following the layout. These dates are confusing.

Further records of the fire department were introduced showing the test mentioned by Charlesworth made January 21, 1928. A photograph, Exhibit Q, was introduced claimed to have been taken during the test. Witnesses have testified that three lines of hose were attached as indicated in the photograph, but the records of the fire department read as follows: "At 2.15 p. m. Company out to Dexter Street to test Baker pipe. Returned at 2.58 p. m., two 32 lines 100 feet each from Pumper 8 at 120 lbs." Undoubtedly a test of a Baker turret pipe was made on that date as shown by the fire company's records, but whether the test was of a turret pipe with legs attached as shown by Exhibit A, or whether the test was of Corley's prior invention, Exhibit U, is doubtful.

There is no question but that the photograph shows a turret pipe in operation with legs like Exhibit A, but when it is considered that it is claimed that a test had already been made of the same appliance with the bronze legs in September, 1927, and that on January 31, 1928, no other form of legs had been made for the company, and when it is further considered that the original figure in the date "1928" has apparently been erased and the figure "8" written in, I am unable to find that the test of January 31, 1928, was of the Baker pipe represented by Exhibit A. It is more probable to my mind that the picture was taken January 31, 1929, just prior to Corley's application for a patent March 5, 1929. It is incomprehensible that if an entirely satisfactory test was made September 23, 1927, and another January 31, 1928, Corley should have waited until March 5, 1929, to file his patent application.

On October 13, 1928, a firemen's convention was held in Philadelphia at which Robinson had on exhibition a turret pipe with hinged legs similar in construction to Corley's claimed invention. Corley attended the convention and saw Robinson's exhibit and some conversation passed between them. If it is true that Corley had successfully completed a turret pipe with elbow and lateral legs and had reduced the same to practice as early as September 23, 1927, more than a year prior to the date of the convention, it is more probable than otherwise that the matter would have been a subject of discussion between them. Corley did not mention the legs and he did not say they were his invention, but on the contrary threatened Robinson with some trouble under patents on the basis that he controlled broadly the idea of a pipe which could be operated either on a fire wagon or removed from the apparatus and set on the ground. He later advertised that his model No. 3 covered by his prior patent could be "used on the ground holding itself without assistance." Exhibit 8, p. 9, Corley's catalogue; also catalogue numbered 7, Defendant's Exhibit 12. Corley had no exhibit at Philadelphia, but the American Fire Equip-

ment Company of Boston exhibited some of the Baker types. There was no exhibit of type A.

John A. Roan, a mechanic employed by the J. M. Baker Company, testified before the examiner that he machined and assembled turret pipes like Exhibit A; that according to his time book, Exhibit P, he began assembling them December 31, 1927; that he fixed the date by the shop No. 501; that prior to March 12, 1929, sixty-nine pipes of this type were made numbered from 501 to 569; and that any pipe of the series 500 was a pipe with swinging legs as defined in the issue of interference. As tending to rebut Roan's testimony, Robinson introduced the invoice of a Baker Universal turret standpipe, No. 524, sold by the Baker Pattern Company June 29, 1928, to the Maxim Motor Company which was not a pipe with swinging legs. Corley tried to explain this testimony by saying that the numbers given to the pipes in the shop were different from the numbers under which they were invoiced. Pipe No. 524, assembled and sold under that shop number, was traced to Watertown, Mass., and proved to be of a different type from that represented by Exhibit A. Roan's testimony and Corley's explanation discredit the claim that the Baker Pattern Company began manufacturing for sale turret pipes with folding legs as early as December 31, 1927. Only one set of legs was made prior to 1929. Their testimony is further discredited by dealings of the company with the Boston Fire Department, which certainly must have been one of the largest potential customers for the plaintiff's fire-fighting devices. Corley's story is that in January, 1928, he had a complete and satisfactory turret pipe like Exhibit A. In April, 1928, the Boston Fire Department requested that he submit to them one of his devices. He sent one manufactured according to his patent 1,738,421, like Exhibit U now before the court. On May 26, 1928, he was told that it was not satisfactory and to take it away. The department then bought one of Robinson's guns. In his dealings with the Boston department, Corley did not even intimate that he had perfected another device which was an improvement on the one shown. His conduct in the matter is so at variance with that of an ordinary business man attempting to sell his goods that it discredits his claim that he had perfected Exhibit A as early as January, 1928. This appears to have been one of the determining pieces of testimony in the minds of the Board of Appeals, as it must be considered by any fact-finding board.

Counsel for the plaintiff have argued that in considering the evidence the court should correlate the testimony of individual witnesses and the exhibits, and that when examined as a whole the testimony discloses a coherence of events establishing the truth of plaintiff's claim. Counsel's complaint is that the examiner and Board of Appeals did not do this. I have tried to consider the evidence from the viewpoint suggested by counsel, but the more closely it is studied the less weight it appears to have in my mind and the more firmly it established the correctness of the earlier decisions upon the evidence submitted.

### Additional Evidence.

Evidence in addition to that used before the examiner consists of the oral testimony of Corley before the court; further depositions of Soderberg. Patnaude, Charles A. Morgan of the Warwick Brass Foundry, Chief Charlesworth and Deputy Chief Fischer of the Providence Fire Department, and new depositions of Adelbert F. Regius, Ralph L. Haddleton, and Edward J. Carberry of said fire department, and Herbert Barlow a patent attorney. New exhibits were filed marked "T" to "Y," inclusive.

The main point in Corley's additional testimony before the court consists in his relation of his attempt to locate the bronze legs and his discovery of the leg pattern. He testified that after the decision of the Patent Board of Appeals, he went to different places to see if he could locate the first and only bronze legs he made; that he inquired without success of the Warwick Foundry thinking they might have been returned and melted up, and that then he went to different places where he had sold water guns to see if they had been used on any gun that had been sold. He finally found them on a pipe sold to the Attleboro Fire Department. Asked on cross-examination when he sold it, whether as late as 1929, he said he could not tell; it might have been after that date. His explanation was that upon receiving an order he was short of aluminum legs, and as there was a difference of only seven or eight pounds, he thought his customer would not know the difference so he attached the bronze legs made in 1925 to the gun now before the court marked "Exhibit T." He further testified that in order to make his appliance lighter he arranged for the manufacture of legs of aluminum alloy, dura-lumin, by the Aluminum Company of America, and three bills dated February 20, 1929, March 6, 1929, and April 15, 1929, for aluminum leg castings, were introduced in evidence and marked "Exhibit Ra." The same

exhibits were used before the examiner in Washington. Further testimony of Corley told of the finding of the leg pattern by the Warwick Brass Foundry Company. He was unable to explain how the pattern which had been sent to the Aluminum Company in Pittsburgh, Pa., for the casting of aluminum legs, got back into the hands of the Warwick Brass Company. The pattern was marked "Exhibit X."

Further depositions of Chief Charlesworth and Deputy Chief Fischer were taken for use in this equity proceeding. The testimony of the former adds very little to his previous testimony. Fischer gave evidence tending to show that he handled a gun like Exhibit T, particularly the legs, and that he discovered the slots in the under part; that he had trouble in trying to close them until he was shown how to release the bolt. He also testified to having been present when tests were made of water guns of the type of Exhibit U. This latter evidence he subsequently changed after having left the witness stand. He came back and said he was confused between Plaintiffs' Exhibit U and the type shown in catalogue, Exhibit 12. The only difference between the testimony of the last-mentioned witnesses and that previously given before the examiner is that their present testimony enters more into minor details not previously mentioned but now recalled.

New depositions of members or employees of the Providence Fire Department were taken. Ralph L. Haddleton testified that he was present at the foamite test and the test of a water gun following it; that he remembered connecting one of the lines of hose; and that he saw the legs extended out and recalled that "if he remembered rightly" he put his foot on one of the extended legs and was told to take it off. Adelbert F. Regius, hoseman, testified that he attended the foamite test at Kingsley street and Harris avenue in September, 1927, and that a standpipe was tested after the foamite test was completed. He said this was the only standpipe test he ever attended. Similar testimony was given by Edward J. Carberry, who said the appliance looked like Exhibit T, except that it had a brassy look.

With reference to the testimony of Haddleton, Regius, and Carberry, it is noted that they came from different hose companies and that the record, Exhibit R, does not mention the name of any one of them as being on duty or detailed to attend the foamite test. The only person mentioned is one Satterly, who was not called as a witness. It seems rather remarkable that three men from different companies should be called upon to witness the tryout and that one should recall he put his foot on one of the legs nine years ago. Charles A. Morgan gave further testimony relative to the finding of the pattern used in making the bronze leg in a garage where some patterns saved from their factory fire were stored. He testified that they tried to make aluminum leg castings but were unsuccessful.

Edmund Patnaude, a draftsman, identified a folder from the office of Barlow & Barlow on which is a pencil notation hardly discernable, "John T. Corley, August 1928." Patnaude gave testimony before the examiner to the same effect, the only addition to his previous testimony being the folder which is marked "Plaintiffs' Exhibit W." The only other notations on the folder are entries made in 1929 and 1930. Undoubtedly the folder was at some time used in connection with Corley's application, but whether it was used solely for the present patent application or some prior application is not definitely settled in my mind. Patnaude testified that after receiving the model it may have been a week or two weeks before his drawings would be completed. He testified he made sketches from a model like Exhibit A which may have been around the office for three or four days.

The Philadelphia convention attended by Corley was in October, 1928. At that time he saw Robinson's turret gun with legs, and if he (Corley) had perfected his invention so that he had a model of a practical operative device in his attorney's office from which patent drawings had been made or were to be made, it seems inconceivable that he should delay filing his application for four months thereafter. Charging the delay to his attorney is not convincing. Herbert Barlow, a patent attorney, identified the file wrapper as coming from his office; but his testimony with respect to details of his office relating to Corley's application throws little light upon the issues in the case. He said there was nothing on the "application patent cover" which indicated he had anything to do with it. He said: "I can't tell anything from this file." His testimony is well characterized by the following question and answer:

"Q. 10. Do you remember a model being delivered to the office of Barlow & Barlow in order to have the drawing made for this application? A. Probably there was such a model as there usually were models as I recall for most of the drawings made for Mr. Corley. I do not remember this one distinct-

ly however, as any different from any of the others."

No books of account or entries containing charges to Corley were produced to verify dates.

### Conclusions.

As a date of conception, Corley relies upon the date in his own handwriting on the layout boards, the earliest of which is October, 1924. On Exhibit D is the further notation: "Final layout—May 1926." The leg drawings show only very slight changes. It is claimed that the first pair of legs was delivered January 5, 1925, yet Soderberg's time book purports to show much time spent on leg patterns in October and November, 1926, after the bronze legs had been delivered. It is not claimed that the Warwick Company failed to make satisfactory castings after January, 1925. In fact, it does not appear that it was ever asked to make more than one pair of bronze legs. Its only failure was to make aluminum legs, and this according to Exhibit K was in April, 1925. No aluminum castings were made until those made by the Aluminum Company of America February 20, 1929 (Exhibit R) shortly before the patent application was filed.

I am not satisfied that the dates on the layout boards are dependable. Neither am I satisfied that the bronze castings were made as early as January 5, 1925. The purported bills, Exhibits J and K, do not appear genuine. All other bills of the Warwick Company are marked with its stamp, "Received payment." J and K are the only bills wherein the subject-matter is capitalized. Their appearance raises a doubt in my mind.

The time book entries are discredited, particularly those of Soderberg and Stearns. Roan's testimony is proven unreliable, and Boyle fixes his dates by those found on the layout boards. He also says the company was working on other forms of turret pipes similar to the drawings for patent No. 1,738,-421. This is of importance. I am satisfied that much if not all of the original time book entries record work perfecting that appliance.

It impresses me as more probable than otherwise that so many turret pipe tests have been made by the Providence Fire Department for the Baker Company (see Baker catalogue, Exhibits 8 and 12) that the witnesses are confused as to the type exhibited at any particular test and have adopted Corley's testimony for their own. The discredited photograph (Exhibit Q) may have had its influence on some of them. It is highly improbable that two tests of the same identical appliance would be made.

If it can be found that Corley conceived the idea of a turret pipe like Exhibit A as early as 1924, I am unable to find that he used due diligence in reducing it to practice. Christie v. Seybold (C. C. A.) 55 F. 69. I am convinced that he abandoned his work on the leg and elbow patterns and devoted his time to perfecting Exhibit U, patent No. 1,738,421, and that he did not resume work on them until after Robinson came into the field and Corley saw his exhibit at the Philadelphia convention. Corley sold a gun of the type of Exhibit U, June 29, 1928, to the Maxim Motor Company, although the testimony is to the effect that if a gun of the type of Exhibit A had been offered it would have been preferred and the difference in price would not have prevented a sale. It is contrary to business practice when the vendor has a better article on the market to sell an inferior one. It does not appear that the Maxim Motor Company or the fire department in Watertown was looking for a cheaper gun.

Perhaps the most potent incident which has influenced my decision is the experience with the Boston Fire Department, as it convinces me that in April, 1928, Corley had not perfected his invention else he would have suggested, when his device was found unsatisfactory, that he had another and better water gun which he would be glad to show them. Corley's contention that he reduced his invention to practice as early as September 23, 1927, is not sustained.

The Examiner of Interference and the Board of Patent Appeals have allowed Robinson priority of invention. In these conclusions I concur.

The plaintiff has not sustained the burden of proof to satisfy me that I ought to override the rulings of the administrative boards.

It follows that the plaintiff's bill must be dismissed.