# LANE & BODLEY COMPANY. v. LOCKE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF OHIO.

No. 52.    Argued October 25, 1893. — Decided November 13, 1893.

In 1871 L. & B., being partners, commenced the manufacture of hydraulic elevators in Cincinnati. S. was employed by them as engineer and draughtsman at a fixed salary of $1200 per annum. While in their employ, and while using their tools and patterns, he invented a stop-valve in 1872, which was patented in February, 1876. In 1876 the partnership was dissolved, and a corporation was formed, called the L. & B. Company, in which the same business was instantly vested in the same interests, and remained there. Meanwhile S. ceased in 1874 to serve L. & B. as engineer and draughtsman, and went into their employ as consulting engineer, at a salary of $2000 per annum. The duties of the latter office did not require him to reside in Cincinnati. He served the partnership in this capacity up to its dissolution, and from that time served the corporation in the same capacity up to 1884. The partnership with his knowledge used his valve in the elevators constructed by them until its dissolution, and after that the corporation used it in the same way and with the like knowledge. In 1884 S. severed his connection with the corporation. During all this time he made no claim for remuneration for the use of his patent, and when asked why he had not, replied that he did not desire to disturb his friendly relations with the L. & B. Company. In 1884 he filed this bill in equity, with the usual prayers for an accounting and for an injunction. *Held,*

(1) That, on authority of *McClurg* v. *Kingsland*, 1 How. 202, it might be presumed that S. had licensed L. & B. and the L. & B. Company to use his invention;

(2) That, on the authority of *Solomons* v. *United States*, 137 U. S. 342, it might be presumed that S. had recognized an obligation, flowing from his employment by the partnership and by the corporation, to permit them to use his invention;

(3) That he was guilty of laches in allowing so long a period to elapse before asserting his rights;

(4) That the excuse he gave for not asserting them was entitled to a less favorable consideration by a court of equity than if his conduct had been that of a mere inaction.

IN EQUITY.    The case is stated in the opinion.

*Mr. L. M. Hosea* for appellant.

*Mr. Thomas A. Logan* for appellee.

MR. JUSTICE SHIRAS delivered the opinion of the court.

On November 26, 1884, Joseph M. Locke, this defendant in error, filed a bill in the Circuit Court of the United States for the Southern District of Ohio, alleging infringement by the Lane & Bodley Company, a corporation of the State of Ohio, of letters patent No. 173,653, dated February 15, 1876, for an improvement in stop valves, issued to said Locke as inventor. The bill contained the usual allegations, and prayed for an injunction and other relief.

The answer, filed on January 24, 1885, denied that Locke was the original inventor, because the same devices were shown in certain specified earlier patents and publications; denied that said invention was not, for more than two years prior to the application for letters patent therefor, in public use or on sale, but averred, on the contrary, that said apparatus was well known and in public use in the United States for more than two years prior to said application. The answer also contained a history of the original development of the alleged invention by Locke, while in the employment of the firm of Lane & Bodley, and averred a continuous use and sale, by defendant, of the alleged devices, with the knowledge and consent of said Locke, in such circumstances as to show the acquisition by Lane & Bodley of an indefeasible license to use the patented devices. By an amendment to the answer, filed on February 12, 1886, there was set up, as an additional defence, an equitable right in the patent, based upon a written agreement signed by said Locke. The answer also averred that said license and right had become vested in the corporation defendant. The case, having been put at issue, was proceeded in so that the Circuit Court found in favor of the complainant, and, after reference to and report by a master, rendered a final decree against the defendant for the sum of $3667.37, with interest and costs.

The record shows us that the court below held that the patent to Locke had not been anticipated, but was valid in all

its claims; that the defendant's answer, in respect to its allegations as to Lane & Bodley's right to a license or to an interest in the patent, was not sustained by the evidence; and that, even if Lane & Bodley had such a right, it had not passed to the defendant corporation, under the doctrine of the case of *Hapgood* v. *Hewitt*, 119 U. S. 226.

Although the defendant has assigned error to the holdings of the court below in these several particulars, we are relieved from considering the contentions as to the validity of the patent or its anticipation by other patents, by the election of the counsel for the plaintiff in error to confine his case to the effect of the pleadings and evidence as establishing an equitable right or license in the defendant company to use the patented invention.

If the court below were right in thinking that the case of *Hapgood* v. *Hewitt*, 119 U. S. 226, was applicable, under the facts of the present case, any further inquiry on our part would be unnecessary.

In that case a corporation employed Hewitt as superintendent, who, while in such employ, invented a plough upon which a patent was granted to him. Having acquired a license growing out of the circumstances of the employment, the corporation was afterwards dissolved, and all its assets passed into the hands of a receiver in liquidation. Subsequently, and under the laws of another State, a new corporation was formed, to which the receiver of the old corporation assigned certain assets, among which, as was claimed, was the aforesaid license. This court held that whatever right the employer had to the invention by the terms of Hewitt's contract of employment was a naked license to make and sell the patented improvement as a part of its business, which right, if it existed, was a merely personal one, and not transferable, and was extinguished with the dissolution of the corporation. This ruling was based on two previous decisions: *Troy Iron and Nail Factory* v. *Corning*, 14 How. 193, and *Oliver* v. *Rumford Chemical Works*, 109 U. S. 75. In both these cases there were formal assignments, without having words or clauses in them showing that they were meant to be assignable, and the hold-

ing of the court was that the contracts themselves were merely personal licenses, and did not import an intent to extend the right to an executor, administrator, or assignee, voluntary or involuntary.

We see no reason to disturb those cases; yet we do not feel compelled to extend their ruling to cover the present case.

It may well be that an express license, set forth in terms, is not assignable unless it is so provided in the instrument. And so there would seem to be no privity, in law or equity, between a defunct corporation of Missouri and a corporation of the State of Illinois. In none of those cases was there evidence showing a recognition, implied or express, by the patentee of any right in the assignee.

In *Hammond* v. *Mason & Hamlin Co.*, 92 U. S. 724, it was held that the non-assignability of a license may be waived if the patentee ratifies the transfer of the license, by otherwise treating the assignee as the licensee was entitled to be treated.

In *Lightner* v. *Boston & Albany Railroad*, 1 Lowell, 338, it was held that a license, though not usually transferable, is transmissible by succession to a corporation formed by the union of two licensees succeeding to the obligations of both, for the reason that the consolidated company is the successor rather than the assignee of the original companies.

In the present case it clearly appears that the company was organized upon the same basis as the firm; that the business of the company was to be the same as that carried on by Lane & Bodley, and to be carried on in the same premises; that the entire property and assets of the firm and its liabilities and obligations were devolved upon the company. Locke himself, in his evidence, repeatedly speaks of the Lane & Bodley Company as the successor to the firm.

And if the defendant's version of the facts is accepted, the acts and circumstances constituting the license and its consideration were begun by the firm of Lane & Bodley, and continued by the corporation, participated in and ratified by Locke himself, to the date of the suit.

Of course, in testing the position of the court below, that, even if the alleged agreement that the firm of Lane & Bodley

should have an interest in the patent, or the facts out of which a license to use would arise, were proven, the plaintiff would nevertheless have a right to recover against the Lane & Bodley Company, we pronounce a legal conclusion on the facts asserted and put in evidence by the defendant.

If, then, the allegations of the defendant in this case are accepted as true, we do not regard the case of *Hapgood* v. *Hewitt* as an obstacle to the defence asserted.

We do not consider it necessary to enter minutely into the history of the case, nor does our view compel us to ascribe to either of the parties or their witness any intentional departure from the truth. We prefer to put our decision upon facts which, if not conceded, appear to have been clearly established.

The firm of Lane & Bodley were manufacturers of engines and machinery at Cincinnati in 1871. In that year they began to manufacture hydraulic elevators, and on November 21 they employed Joseph M. Locke, as designing engineer and draughtsman, to assist them in the development and construction of elevators and other machinery, at a salary of $1200 per year. He continued in the employment of the firm at Cincinnati until some time in 1874, when he went to Salt Lake City, where he remained, with frequent visits to Cincinnati, until the latter part of 1884. During this period he was more or less continuously in the employ of Lane & Bodley, and of the Lane & Bodley Company, a corporation formed in 1876 to carry on the same business and in the same interests, as consulting engineer, on a salary of $2000 per annum, with a contribution of $20 per month for office rent.

While in the employ of Lane & Bodley, at Cincinnati, Locke made many efforts to devise a stop-valve to be used in the elevators. That he was experimenting in this direction was well known to his employers.

The testimony of Lane and of Locke, while contradictory as to the extent in which Lane contributed to the perfection of the invention, clearly shows that many futile attempts were made in the workshop of Lane & Bodley, involving the use of their tools and patterns, before finally — some time in 1872 — the valve that was subsequently patented was produced, and

it went immediately into use by Lane & Bodley, and was used by them and the Lane & Bodley Company continuously, with the knowledge of Locke, from that time till the bill was filed in November, 1884.

In February, 1874, Locke left the works of Lane & Bodley, and on May 27, 1874, he made application for the patent. It does not appear that Lane & Bodley knew of this application till the letters patent were granted, February 15, 1876. While Locke was living in Salt Lake City, and in the receipt of a salary from the Lane & Bodley Company — as he himself admits, at least from 1880 to 1884 — he placed an order for the company from the Horn Silver Smelting Company for a hydraulic hoister, containing the stop-valve according to the Locke patent, and he was aware of several instances of elevators sent to that part of the country by the defendant, in which was used the patented valve. On August 30, 1884, Locke wrote a letter to the Lane & Bodley Company, severing his connection with them, and on November 26, 1884, filed his bill.

There was evidence on behalf of the defendant tending to show that an actual agreement had been entered into between Locke and Lane & Bodley, whereby the latter were to have an interest in any and all improvements in the line of their manufacture which might be made by Locke during the period of his employment by the firm, and a right on certain terms to have the exclusive ownership of such patents as should be issued for inventions so made; and the defendant set up such an agreement in an amendment to the answer.

But we agree with the court below in thinking that such agreement was not made out by the evidence; and, indeed, that view of the case has not been pressed in this court. The defence really relied upon is that of a license arising upon implied contract based upon the relation of the parties and the nature of the transactions.

In the case of *McClurg* v. *Kingsland et al.*, 1 How. 202, the facts were very similar to those of the present case. Harley was employed by the defendants at their foundry, receiving wages from them by the week; while so employed,

he claimed to have invented the improvement patented; after several unsuccessful experiments, he made a successful one in October, 1834; the experiments were made in the defendants' foundry, and at their expense. Harley continued in their employment on wages until February, 1835, during all which time he made rollers for the defendants, using his method; he often spoke of obtaining a patent, and finally, on the 3d of March, obtained a patent. While Harley continued in the defendants' employment, he proposed that they should purchase his right, which they declined; he made no demand on them, and gave them no notice not to use his improvement, till, on some misunderstanding on another subject, he gave them such notice, left their employment, and assigned his patent to the plaintiffs, who brought an action for infringement against the defendants.

The trial judge instructed the jury that if the foregoing facts were found to be true, they would fully justify the presumption of a license, a special privilege, or grant to the defendants to use the invention; that such facts amounted to "a consent and allowance of such use;" and show such a consideration as would support an express license or grant, or call for the presumption of one, to meet the justice of the case, by exempting them from liability; having equal effect with a license, and giving the defendants a right to the continued use of the invention.

These instructions received the approval of this court, and the judgment of the Circuit Court was affirmed.

In *Solomons* v. *United States*, 137 U. S. 342, this subject again came before this court for its consideration, and it was held that " when a person in the employ of another, in a certain line of work, devises an improved method or instrument for doing that work, and uses the property of his employer and the service of other employés to develop and put in practicable form his invention, and explicitly assents to the use by the employer of such invention, a jury, or a court, trying the facts, is warranted in finding that he has so far recognized the obligations of service flowing from his employment and the benefits resulting from his use of the property, as to have

given to such employer an irrevocable license to use such invention;" and the case of *McClurg* v. *Kingsland* was affirmed and applied.

The facts of the present case fairly bring it within the doctrine of these cases. There is, however, another feature in this case, not present in the cited cases, which is of great significance, and that is, the long period that the plaintiff permitted to elapse before he resorted to his legal remedy. The invention, as we have seen, was perfected in 1872, and was immediately and from that time continuously used by Lane & Bodley and by the Lane & Bodley Company. The suit was brought on November 26, 1884, a period of twelve years. In the interim the plaintiff continued, for most of the time, in the defendants' employment, and admits that he knew that Lane & Bodley and the Lane & Bodley Company were using the patented valve. He does, indeed, claim that in 1875 and 1876 he had conversations with Lane, in which he demanded an arrangement or settlement for the use of his invention, but he admits that, in 1876, Lane repelled him and refused to talk upon the subject. According to Locke's own account, he dropped the matter, and continued to acquiesce in defendants' use of his patent, and to receive a salary from them for a period of several years.

When asked to account for his conduct in this respect, his explanation was that he felt convinced that any demand he might make would have been rejected, and thus his friendly relations with the defendants be disturbed.

On cross-examination the following question was put to him: "Did you in any of your letters to Lane & Bodley refer to the matter of the valve, and ask for any recognition or adjustment of your claim?" To this his answer was: "I did not, for the reason that I had the impression in my mind, from the interview with Colonel Lane at Philadelphia, that Lane & Bodley were not inclined to fulfil promptly the verbal understanding of the preceding year, or, at least, would attempt to open negotiations for more favorable terms, and I did not deem it prudent to open up the matter until I was in a position as for time and means to carry forward claims to

my right; which conditions I was in hope would occur from time to time, but such conditions, in my judgment, were not realized at an earlier date than 1884."

Again, the following question was put to him by his own counsel: "You have been asked, substantially, why you continued your amicable relations with the company from the West after this evasion of Col. Lane in Philadelphia in 1876. It was also pointed out that you had not mentioned the matter to them from there. Please explain why this was so." His answer was: "I did not regard it as either right or prudent to have other than amicable relations with them so long as they had not actually refused to comply with the agreement of April, 1875. I did not write to them so as to bring up the issue, as I had neither the time nor the means at my command to enforce my rights in case of the refusal to comply with their agreement at that time."

The existence of any agreement in 1875 was strenuously denied by Col. Lane; but, conceding the plaintiff's version of the disputed facts to be true, he yet permitted eight years more to elapse before he made a hostile move. The "amicable relations" he desired to have continued were evidently those out of which he was receiving a salary of $2000 per annum — a sum larger than he would have been entitled to if he had been in receipt of a royalty.

Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them. The plaintiff's excuse, in this instance, that he preferred for prudential reasons, to receive a salary from the defendant rather than to demand a royalty, is entitled to a less favorable consideration by a court of equity than if his conduct had been that of mere inaction.

We are, therefore, of opinion that the decree of the court below should be

*Reversed, and the record remanded to the Circuit Court,*
*with directions to dismiss the bill of complaint, and it is*
*so ordered.*