## SMALL v. HEYWOOD-WAKEFIELD CO.
### No. 3973.

District Court, D. Massachusetts.
Jan. 2, 1936.

Paul K. Connolly, James H. Baldwin, and Kenway & Witter, all of Boston, Mass., for plaintiff.

Herbert A. Baker and Alan B. Bagley, both of Boston, Mass., for defendant.

McLELLAN, District Judge.

This is a suit by the patentee of United States letters patent No. 1,826,532, for alleged infringement.

While an attempt is made to separate findings of fact from conclusions of law, all statements of fact wherever they appear are intended as findings of fact and all legal conclusions as conclusions of law, under the equity rules.

The issues include the validity of the patent, the defendant's contention that it is entitled to a conveyance of the patent, and that at least it has a shop right therein. The infringement of claim 7 of the patent in suit is stipulated, and the question whether claims 1 and 3 are infringed is to be considered.

The evidence as to the validity of the patent involves no serious question as to the credibility of witnesses, but the evidence as to the defendant's alleged right to a conveyance and its alleged shop right is conflicting and some of it incredible. This testimony is considerable in amount, and no attempt will be made to summarize it in detail. In other words, facts are to be stated, without an attempt to state the testimony in favor of the facts thus found or the testimony having a different tendency.

Though the briefs of counsel adopt a different order, it seems to me that the first question to be determined is as to the validity of the patent.

*The Validity of the Patent.*

The patent in suit, No. 1,826,532, was issued to Edward F. Small under date of October 6, 1931, and covers a base for a rotatably reversing chair for use in railway coaches. The specification states that the invention relates to reversion means adapted to a double or single seat with a permanent back supported on a single base, and provides for a lateral movement of the seat on the base to an extent sufficient to clear the wall or window of the car and at the same time a rotation of the seat within predetermined limits, effecting a complete reversal of position. According to the specification, this is accomplished in substance as follows:

The top of the base is provided with a recessed portion of general pentagonal shape. The pentagonal configuration of this recess defines the limits of movement of the reversing elements, the movements of the elements defining the shape of the recess, as the operation would take place exactly the same on the level surface, the recess being provided in order that none of the operating parts need be exposed to outside influences and so that there may be a smooth unbroken joining of the base and chair.

Within the recess are two similar pivoted reversing arms, each of which has a downwardly extending pivot which is fixed and an upwardly extending pivot which is movable. The arms may be considered primarily as radii, and each is of length more than half the distance between their pivot or center. As such their free ends inscribe arcs which intersect at two points. These two points establish the line of the "front to rear" position of the seat. Beyond these intersecting arcs each radius arm may swing until in symmetrical disposition they would reach a position where they may be said to be in deadlock. However, by continued rotation as of the seat, one arm is receded beyond the symmetrical disposition which has been rather arbitrarily designated as a pentagon. By so receding, the other arm is permitted or compelled by the linkage of the seat disc to assume the lead of the first arm. This means that the "linkage" has been reversed or the seat disc rotated 180°.

In normal position the arms are positioned in one or the other of two positions (indicated in Figures 4 and 8 of the drawing). The fixed pivots are placed approximately in the side angles of the pentagonal recess. The two movable pivots are in alignment with the apex of the pentagon midway between the two stationary pivot points; that is, really in the "altitude" of the pentagon.

Each lever moves on its stationary pivot and the free end of each inscribes its own arc. These arcs intersect; the pivots being held by their pivotal bearing in the seat disc at a predetermined distance from each other on the seat disc. The distance between the pivots must be the distance between the points of intersection of the arcs inscribed by the arms considered as radii; otherwise it would be impossible for the arms to clear each other during the rotation of the seat disc.

To follow the course of the arms during a complete semirevolution of the seat, assume for the purposes of illustration that the seat is facing downward and that it is desired to face the same in the opposite direction. The seat disc and connected seat is held in position by means of a stop and a treadle controlled lock. When the lock is removed, the seat disc is free to rotate. As force is supplied, the arms swing to a position where they are neutral and the chair can be turned in either direction as desired. Continuing the reversal of the chair, the position of one arm returns while the other arm continues its course of outward travel, receding to allow the first arm to take the lead. It then follows back to position. At this point the first arm which has been on one side now lies on the opposite side of the other arm.

The next reversal of the seat necessarily must be in the opposite direction, as further movement of the first arm in the same direction will be prevented by the

engagement of the end of that arm by the apex wall of the pentagonal recess.

It is thus possible to move the seat which it is desired to reverse in the general lateral direction until the levers are in the proper position. From that point the seat travels inwardly until the seat disc reaches the desired position. When in either position, the seat is locked by a detent operated by a foot lever.

Claims 1, 3, and 7, on which the plaintiff relies, read as follows:

"1. In a reversible chair, a base, a rotatable seat structure, and a connection between said base and said seat structure comprising a pair of arms each pivoted to said base and to said seat structure, the distance between the two pivots of one arm combined with the distance between the two pivots of the other arm exceeding the distance between the points of pivotal connection of said arms with said base, whereby the pivots between said arms and said seat are adapted for movement in intersecting arcs, and the distance between the points of intersection of said arcs. * * *

"3. In a reversible chair, a base, a rotatable seat structure, and a connection between said base and said seat structure comprising a pair of arms each pivoted to said base and to said seat structure, the distance between the two pivots of each arm being equal and less than the total and greater than one-half of the distance between the pivots of said arms with said base. * * *

"7. In a reversible chair, a base, a rotatable seat structure, and a connection between said base and said seat structure to permit rotation of said seat structure and to require lateral shifting movement of the latter during its rotation, said connection comprising a pair of arms each pivoted to said base and to said seat structure."

The defendant says the patent is invalid because it involves merely the use of an old and well-known device transferred to a new use not involving the exercise of the inventive faculty.

There were introduced in evidence nine patents prior in date to the patent in suit. Eight of them pertain to car seats. Only three of the eight are of such importance as to have been mentioned in the defendant's brief. They show that prior to the patent in suit constructions which permitted a chair seat in a railroad or other car to be moved laterally of the car and reversed in position to face in the opposite direction were well known. The plaintiff concedes this much, but denies its importance. These eight patents contained nothing anticipatory of the plaintiff's invention. They recognized the problem successfully solved by the plaintiff and each was an attempt to meet it, but Small's device was the first simple and entirely successful solution. The defendant relies chiefly on the mechanical movement shown in the Wolcott patent No. 1,617,559 for an electric toaster. In the summer of 1928, and prior to making his invention, the plaintiff received an electric toaster as a gift, which was made in accordance with the Wolcott patent, and this toaster "started a train of thought" in the plaintiff's "mind that eventually turned into a car seat base." The drawing and claims of the Wolcott patent incorporated herein by reference, show a mechanical movement in a toaster very similar to the mechanical movement shown in the plaintiff's patent. Among others are the following distinctions between Wolcott's device and the device of the patent in suit: (1) Small's patent is limited to reversible chairs —Wolcott's to an electric toaster; (2) Small's base would be usable without the links, the disc being supported on and by the base and the links serving only to guide the movements of the seat supporting structure—Wolcott's toast carrier is supported solely on and by the links; (3) Small's links are relatively short and are located entirely beneath the chair and beneath the disc— Wolcott's links are relatively long arms and are not at all times beneath the carrier; and (4) Small's device is meant to carry a heavy load—Wolcott's only a piece of toast.

There are, I believe, sufficient distinctions between the devices of Wolcott and of Small so that the former cannot be said to invalidate the latter. Moreover, these two patents cover devices in widely divergent arts. The use of elements old and known in one art in a new and useful combination in another and nonanalogous art may constitute invention. Hobbs v. Beach, 180 U. S. 383, 21 S.Ct. 409, 45 L.Ed. 586; Trico Products Company v. Apco-Mossberg Corporation (D.C.) 34 F.(2d) 672, affirmed in (C.C.A.) 45 F.(2d) 594, 597; Economy Appliance Company v. Fitzgerald Manufacturing Company (D.C.) 35 F.(2d) 756; Erie Steel Construction Company v. Blaw-Knox Company (C.C.A.) 47 F.(2d) 899; W. N. Matthews Corporation v. Alliance Securities Company (C.C.A.) 42 F.(2d) 439.

828

The patent involves invention. The invention is a meritorious and valuable contribution to the art. The defendant has made as many as five thousand of these seat bases. These facts strengthen the presumption of validity arising from the granting of the patent, which persists in spite of the fact that the Wolcott patent pertaining to an unrelated art was not cited by the Patent Office.

The patent No. 1,826,532 is valid as to claims 1, 3, and 7 relied on by the plaintiff.

*Infringement.*

■ The infringement of claim 7 in suit has been stipulated. This is the broadest of the three claims on which the plaintiff relies. The bases manufactured and sold by the defendant employed the principles of the patent in suit, including the limitations contained in claims 1 and 3. My conclusion is that the defendant has infringed claims 1, 3, and 7.

*The Defendant's Counterclaim.*

The Alleged Right to an Assignment of the Patent:

Whatever construction should be placed upon the defendant's counterclaim as set forth in its answer, the case was tried upon the theory that the defendant was entitled either to an assignment of the patent or to a nonexclusive license to use it without compensation to the plaintiff. The questions now considered are, therefore: (1) Was the defendant entitled to an assignment of the patent? (2) Has the defendant a shop right in the patent?

There are so many facts which are relevant to both these questions that it is proposed to treat them together.

■ It is the defendant's contention in substance that the plaintiff was employed as an inventor, and that, even if he was not so employed, there was a well-established custom in the defendant's plant by the terms whereof it was the duty of persons employed as the plaintiff was to assign any inventions which they might make to the defendant. Such conflicting testimony as was adduced with reference to the alleged custom leads irresistibly to the conclusion that, while on occasions employees had assigned their inventions to the defendant, no real custom was established. I have no hesitation in believing the plaintiff's testimony to the effect that he knew of no custom. Nor were the circumstances such that it can be said that the plaintiff as a reasonable man ought to have known of the occasions when any of the defendant's employees assigned their inventions to the defendant. A consideration of a part only of the evidence might seem to warrant the view that the plaintiff was employed to make an invention. A careful examination of all the evidence, with the aid which often comes from seeing and hearing the witnesses, leads me to find, and I do find, that the plaintiff was not employed as an inventor.

In April, 1927, and before the plaintiff's employment began, the defendant obtained a license under patent No. 1,676,010 to one Duffy for rotating car seat bases, in which a rotating movement could be had for reversing the direction of the seat and maintaining the position of the chair adjacent the wall. The Duffy base was complicated, heavy, and costly, and was not considered satisfactory by the defendant. Attempts were made to improve it, without any substantial success.

Small, the plaintiff, was employed by the defendant on or about September 27, 1927, as a draftsman. The duties of the drafting or engineering department are defined in defendant's outline of procedure, Exhibit A, and this, in connection with other acceptable evidence in the case, shows that the drafting department was not charged generally with the duty of inventing new designs, but merely with the duty of making such slight changes in the details of the drawings of the company's standard products as would meet the requirements of different orders so that they would conform to the varying needs of customers.

In the spring of 1928 the plaintiff was given the job of "checker." His duties as such included checking the drawings in the drafting room, checking the work with the drawings as it went through the various departments, and changing the factory orders and drawings in the several departments to correspond with any changes made in the originals. This work was a full-time job and kept the plaintiff out of the drafting room from 50 per cent. to 75 per cent. of the time. Originating new developments was not a part of the plaintiff's duties in this capacity.

According to his testimony, the head of the defendant's car seat department issued instructions to the plant engineer that the engineering (or drafting) department should attempt to design a better base than the Duffy base, one that would be lighter, more efficient, and less costly to manufacture. I find that some such instructions

were given to the plant engineer. The defendant urges that the plaintiff and one Chandler, a draftsman, were specifically assigned to this work by the chief draftsman and the plaintiff's immediate superior. As I view the conflicting evidence, no such instructions were given to the plaintiff.

During July, August, and September of 1928, the plaintiff worked on and developed the invention of the patent in suit by making sketches, drawings (including the drawing dated August 14, 1928, marked Plaintiff's Exhibit 3), and models (including a wooden model which was introduced in evidence and marked Plaintiff's Exhibit 2). All this work was done by the plaintiff on his own time, with his own materials, and in his own home.

About the middle of September, 1928, the plaintiff brought to the defendant his models, including Exhibit 2 referred to above, and showed them to the chief draftsman and others. The plaintiff's co-workers and superiors had no knowledge of his experiments and development of a new type of base until September, when the models were brought in. The evidence was convincing, and I find, that the wooden model brought in by the plaintiff was so complete that those in authority, in the defendant company believed the invention involved in the model would meet their requirements. It was decided by the defendant to make a full-size wooden model, and later metal models of the S (Small) type base. The plaintiff was requested to and did prepare working drawings of his base in the company's drafting room during working hours, was in touch with the work of making up the models, and lent his assistance to this work. From September, 1928, to April, 1929, several models and sample bases of the S type were made up by the defendant. Certain changes were made, which did not improve the base. These changes were later abandoned, and the defendant has since made the S type bases in accordance with the principles of the wooden model originally made by the plaintiff at home.

The defendant had what was known as a "Suggestion System," whereby, when any employee had an idea for an improvement, he could put in a "suggestion," and prizes were awarded for those suggestions which appeared to have the most merit. Soon after the plaintiff brought in his model and many times thereafter, he was asked to turn over his invention by means of this suggestion system, but he declined to do so. About the 1st of April, 1929, and after the completion of the final sample base, the plaintiff was asked to sign a patent application and an assignment which had been prepared by the defendant's patent attorney without the plaintiff's knowledge or consent, but he refused. He was offered $250, the total amount of the prizes provided for by the suggestion system, and declined it He was asked what he did want for his base, and he came back the following morning with a price of $10,000. This was taken up with the authorities, and the plaintiff was finally offered $750. On April 15, 1929, Small was taken to the office of the defendant's patent attorney, where he was advised that the defendant had a shop right in his invention, and was free to manufacture the base without compensation to the inventor. The plaintiff still refused to assign his invention or to sign the patent application, and on or about April 22, 1929, he was discharged from the defendant's employ, prior to the time when the S type base was placed in production by the defendant.

The plaintiff, not having been employed to make this invention or to do inventive work in a particular field, and having no knowledge of any such custom as the defendant sought to show, was and is under no obligation to convey his patent to the defendant. United States v. Dubilier Condenser Corporation, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488. See, also, Standard Parts Company v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033, and Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667.

The Alleged Shop Right:

The question whether the defendant under the circumstances acquired a nonexclusive license to use the patent without charge presents greater difficulty. In the solution of this question I derive little assistance from authorities cited to the effect that an invention is not complete until there has been an actual reduction to practice. It will be found that as a rule these cases involved interferences where two or more persons are seeking to establish prior rights to the same invention, and where the question of priority becomes material. No question of priority is here involved. As heretofore found, the plaintiff's models and drawings, as disclosed to the defendant in September, 1928, disclosed an in-

vention. The real question under discussion is whether the circumstances are such as to show a contract between the parties by the terms whereof the defendant became entitled to a shop right. In this connection I am not unmindful of judicial utterances to the effect that the question is whether the inventor is estopped from denying the existence of a shop right. If a person orders a sack of flour from his grocer and the grocer delivers it, I should prefer to think that the obligation to pay for the flour was based upon a contract, no matter what the customer's secret intention may have been. The same result follows, however, if one chooses to treat the existence of the contract as depending upon the secret intention of the parties and says that a person is estopped from showing that his secret intention was different from that which his words and conduct indicated. The question as to the existence of a contract for a shop right and the estoppel question are treated together as being dependent upon the same facts.

I understand that no controversy between the parties exists as to the general proposition that, where an employee conceives an invention applicable to the employer's business, where he uses the property of the employer to put his invention in practical form and where he allows the employer to make, use, or sell specimens of the invention, no compensation for its use being paid or demanded, an implied shop right may be found. McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102; Gill v. United States, 160 U.S. 426, 435, 16 S.Ct. 322, 40 L.Ed. 480; Solomons v. United States, 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L.Ed. 1049; Wilson v. American Circular Loom Company (C.C.A.) 187 F. 840; Bowers v. Woodman (D.C.) 59 F.(2d) 797.

In the case at bar there are circumstances, as I view them, which are inconsistent with the implication of a contract for a shop right and with an estoppel. This is not a case where the plaintiff sought the defendant's assistance. Nor is it a case where the defendant simply offered assistance to the plaintiff and the plaintiff accepted it. The defendant's expenditures were made under the claim that the defendant was entitled to a conveyance of the invention. The expenditures were made for the defendant's own purposes, not for the purpose of assisting the plaintiff. Nor was the plaintiff's expressed conduct consistent with any willingness on his part to grant a shop right to the defendant, and the defendant knew this. From the beginning to the end, the plaintiff's position was that he would not assign his invention to the defendant, as requested, and that all he would do was to sell it for a price. The defendant, having first prepared a patent application and an assignment, asked the plaintiff to sign them. The plaintiff refused to do so. The defendant first offered him a "suggestion" prize of $250. The plaintiff declined it and was asked for a counter offer. After consideration, he proposed a price of $10,000. There ensued an offer by the defendant of $750, which was refused. The plaintiff's invention was complete when he presented his models to the defendant. It was conceived and perfected in his own home, outside of working hours, and with his own materials. The plaintiff did not request that the defendant make models for his use and benefit. He merely permitted it and lent his assistance in order that those in authority in the defendant company, who believed the invention would meet their requirements, might be certain of it. This work was done for the defendant's benefit, by its volition and with a view to the acquisition, not of a shop right, but of the invention itself. Nor did the plaintiff permit the defendant to make, use, and sell these devices without compensation. His whole course of dealing as disclosed to the defendant indicated that he regarded the invention as his own and would afford the defendant no rights under it unless and until they should make a satisfactory agreement in regard to compensation. If there are circumstances under which, notwithstanding the foregoing facts, a shop right is to be inferred, this does not seem to me to be such a case. Here, the plaintiff's invention when brought in for the inspection of the defendant's officials was too simple in conception and too far advanced in development to warrant any such inference in the face of the plaintiff's oft-repeated demands for compensation of some sort. The invention consisted of a single movement. The inventive act consisted in applying this movement to a car chair base, when it had never been used before in that or any related field. The plaintiff had reduced his conception to a fairly complete blueprint and several working models before consulting any official of the defendant. From the moment when the idea was originally submitted to the defendant, there

seems to have been very little doubt as to its successful use. As stated by one of the defendant's officials, "It was complete enough so that you could see it was going to meet the requirements." A minor change suggested by the defendant, temporarily adopted, was abandoned as useless.

The creation of a shop right may not here be ruled as a matter of law. If the circumstances are such that the contrary may not be ruled as a matter of law, the question is one of fact. If such be the situation, I am constrained to find as a fact that the plaintiff conferred no shop right upon the defendant. See Massie v. Fruit Growers' Express Company (D.C.) 31 F. (2d) 463; Kny-Scheerer Corporation v. American Sterilizer Company (D.C.) 5 F. Supp. 273; and White Heat Products Company v. Thomas, 266 Pa. 551, 109 A. 685.

The case at bar is distinguishable on its facts from such cases as McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102, and Solomons v. United States, 137 U.S. 342, 11 S. Ct. 88, 34 L.Ed. 667, in both of which cases the patentee conducted his experiments at his employer's expense while receiving wages and where the facts heretofore found as preventing the implication of a shop right were entirely absent.

The Defendant's Request that Certain Excluded Evidence be Now Admitted:

 In making the foregoing finding that the plaintiff conferred no shop right upon the defendant, I am not unmindful of certain testimony which was received and certain other testimony which was excluded on which the defendant relies. As heretofore indicated, after the defendant had received from its patent attorney an application and an assignment, and these papers had been presented to the plaintiff and he had refused to sign them, two or three of the defendant's officers or employees were at the office of the defendant's lawyer with the plaintiff. According to the testimony from the defendant's witnesses, Mr. May, defendant's counsel, in the course of a conversation with the plaintiff, explained to him the legal basis of a shop right, and the plaintiff replied in effect that, having received the described assistance from the defendant, the latter was entitled to a shop right. Later, the defendant, having shown Mr. May's decease, sought to introduce in evidence a portion of his diary which stated in substance that at the interview the plaintiff conceded the existence of a shop right in the defendant. Not unmindful of American Railway Express Company v. Rowe (C. C.A.) 14 F.(2d) 269, an action at law in which the admissibility of statements made by deceased persons under General Laws, c. 233, § 65, was determined in a majority decision, I excluded the proffered evidence. In its brief, the defendant now asks me to reverse the ruling then made. I decline to do it. In discussing this question it is unnecessary to attempt a solution of the controversial question as to whether in a suit in equity statements made by deceased persons may under the statute be received. Nor is it necessary to indulge in the extended citation of cases. It was held early that the statute did not render admissible admissions made by one of the parties to the action to a deceased person. As stated by Loring, J., in Knapp v. Bronson Building Company, 226 Mass. 416, 115 N.E. 671:

"By the true construction of it R.L. c. 175, § 66 [now G.L., chap. 233, § 65], authorizes the admission in evidence of the statement of a deceased person where the statement concerns a fact of which the deceased had personal knowledge. But we are of opinion that this act does not authorize the admission in evidence of a declaration of a deceased person that a party to a cause had made an admission against his interest.

"The case which the Legislature had in mind when it enacted that statute is the case first put above, namely, where the declarant had personal knowledge of a relevant fact and stated the fact and the statement was made in good faith before the commencement of the action. R.L. c. 175, § 66, takes away some of the safeguards which the common law imposed upon the admission of testimony to protect the party against whom the testimony is directed from error and falsification. There is a material difference in the chances of possible error and falsification in case a party undertakes to put in evidence not the statement of a person who knew a fact but the statement of a person that he had heard a party make a statement which was an admission. The statute should not be construed to go beyond the cases plainly within the contemplation of the Legislature."

This construction of a Massachusetts statute by the highest Massachusetts court is binding upon me.

 But there are other reasons for excluding the evidence which was offered under the statute. The statement appearing

in Mr. May's diary was not only a conclusion, but it was largely a conclusion of law. The entry does not purport to disclose what the plaintiff said to Mr. May, but the latter's view as to the purport of the whole conversation. It should be added that this evidence, if received, adds little or nothing to the case. Upon other testimony I find, though with some hesitation, that, after Mr. May had explained to the plaintiff the legal basis of a shop right, the plaintiff expressed the view that the defendant had one. Such a statement, shortly before his discharge, by a layman to a lawyer, under the circumstances of this interview, seems to me not very helpful upon the question whether from the facts here disclosed I ought to infer the existence of a shop right.

*Conclusion.*

The conclusion is that claims 1, 3, and 7 of the patent in suit are valid and infringed, and that the defendant's counterclaim is to be dismissed.