## HEYWOOD–WAKEFIELD CO. v. SMALL.
### No. 3177.

Circuit Court of Appeals, First Circuit.
Jan. 26, 1937.

MORTON, Circuit Judge, dissenting.

———◆———

Herbert A. Baker, of Boston, Mass., for appellant.

Herbert W. Kenway, of Boston, Mass. (Paul K. Connolly, James H. Baldwin, and Kenway & Witter, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal by the defendant from a decree of the District Court holding claims 1, 3 and 7 of a patent, No. 1,826,532, issued to the plaintiff, Small, valid and infringed, and dismissing defendant's counterclaim for an assignment of the patent to the defendant, or, in the alternative, for a "shop right" in the defendant under the patent. We shall refer to the parties, plaintiff and defendant, as they appeared in the trial court.

The suit below was brought by the plaintiff for infringement of his patent which covered a base for a reversible car seat for use in trolley cars and railroad coaches. Infringement of claim 7 of plaintiff's patent was admitted; and the court found that claims 1 and 3 were also infringed. In the court below the defendant contended that the patent was invalid, but this contention is no longer insisted upon.

The real grounds raised by the defendant's appeal are that it was entitled, either to an assignment of the patent, or at least to a "shop right" amounting to an exclusive license under it, and that the judgment against it on these points was wrong. The basis on which the defendant's contention rests is that the plaintiff was employed by it, and a part of his duties as such employee was to invent new devices or new methods or improve those in vogue in the defendant's business; or that, apart from his regular duties, he invented a car seat base and developed it in the defendant's factory and at the defendant's expense. On the first alternative the defendant would be entitled to an assignment of the patent; on the second alternative, to a "shop right" under it.

The defendant has a large factory in which it manufactures, inter alia, car seats for trolley cars and railroad coaches. It first employed the plaintiff in the fall of 1927 as a draftsman. This employment continued until March, 1928, when Small was promoted and made a "checker." It was while employed as a checker in July, August, and September, 1928, that Small invented the car seat base for which the patent in suit was issued.

The defendant contends that the plaintiff was employed to invent improvements in its line of goods and that the results of his efforts at invention belong to his employer. Houghton v. United States (C.C. A.) 23 F.(2d) 386, 390; United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488. The plaintiff says that his employment was not of that character. There was some conflict of testimony as to what duties were involved in plaintiff's work as "checker." The defendant's contention was that if the plaintiff "saw, as he checked through the work, that improvements could be made on it, * * * he could offer these suggestions and have changes made in the

drawings" that such duties "went with the position of checking." The plaintiff testified that his duties were "to check every part of the car seat, and all parts of the car seat,—reed furniture shop, machine shop, wood shop, upholstery shop, cutting room, and paint shop. My work was entirely on car seats. * * * It was my job to see that the goods were made according to the orders." The plaintiff's immediate superior, a Mr. Eichel, testified that: "The duties of checker were to look over the products of manufacture whenever it was requested from the shop, the foreman or the superintendent. We generally went down, looked them over and passed on them. And then before the article went through to another department that was going to use it, they would request a check on it. The checker would change the orders, would check the drawings in the drafting room and check the work in the shop from those drawings."

Eichel further testified that he did not recall ever having given the plaintiff definite orders to design a rotating car seat base; and no such instructions appear to have been given to the plaintiff by anybody else. Nor does it appear that the plaintiff was ever assigned to the work of inventing improvements on the company's products.

■ In finding that "originating new developments was not part of the plaintiff's duties in this capacity (as checker)," it certainly cannot be said that the District Judge was clearly in error. It follows that the defendant was not entitled to an assignment of the patent.

On the question of whether the defendant was entitled to a "shop right" either upon the basis of a contract on the ground that the work of invention was on the defendant's time and at its expense, or on the ground of estoppel, that he saw his invention being used by the defendant without protest on his part, none of the cases cited supports the defendant's contention.

The cases of McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102; Solomons v. United States, 137 U.S. 342, 346, 11 S.Ct. 88, 34 L.Ed. 667; Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 37 L. Ed. 1049; Keyes v. Eureka Mining Co., 158 U.S. 150, 15 S.Ct. 772, 39 L.Ed. 929; Gill v. United States, 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480, all differ widely from the facts in this case. In these cases either the plaintiff made the invention on his employer's time and at his employer's expense and it was a part of his duty to improve the methods used by his employer, or he stood by for a long period and permitted his employer to use his invention without protest before making any claim.

Nor do we think the case of John M. Burton v. Burton Stock-Car Co., 171 Mass. 437, 50 N.E. 1029, has any bearing on the issues in this case. In that case there was an assignment of an invention with the stipulation that the plaintiff reserved the right to royalties in the future and was assured by the defendant that that would be adjusted later. The court said, at page 440 of 171 Mass., 50 N.E. 1029, 1030:

"There was no evidence, so far as appears, that the plaintiff agreed to license the use of his improvements gratuitously, and in the absence of such an agreement an implied promise to pay might be inferred from the above facts. Walk. Pat. (3d Ed.) § 312."

Certain facts in this case are not in dispute. The plaintiff knew that the car seat base then manufactured by the defendant was unsatisfactory. The plaintiff's invention, however, was suggested to him by the mechanism of an electric toaster at his home. He worked on his idea at his home out of working hours and finally evolved what he confidently believed to be a satisfactory reversible car seat base. He made a blueprint and a cardboard model of his invention which he brought in and showed to Mr. Eichel, the head man in the checking department. Eichel, a witness for the defendant, testified that the plaintiff said to him "I have got it," referring to the car seat base. "I told him I felt pretty sure he did have it, because it met the requirements that I figured should be in a base." Eichel also testified that the plaintiff appeared excited, which was indicated by his statement on showing his model: "I told Mr. Eichel I had the best God damn base which was ever invented."

Eichel suggested to him that he ought to have a wooden model, but stated that his cardboard model was complete enough "so that you could see it was going to meet the requirements." The next morning the plaintiff brought in what is termed a "cigar box model," which the plaintiff had made at his home from thin board.

There is no contention now that the plaintiff knew of a custom at the plant that improvements in methods of work or in products of the company were to be turned over to the defendant.

There was conflicting testimony as to what occurred after the plaintiff brought in his models and showed them to Eichel and Chatterton, the plant engineer. The District Court, however, made certain findings of fact based upon the undisputed evidence, and where there was dispute as to facts his findings must have depended upon which of the witnesses he believed. Unless we can say his findings were clearly wrong, his final conclusion must stand if his findings support it.

The plaintiff testified that Mr. Chatterton, the plant engineer of the defendant, upon being shown his cardboard model in September, 1928, advised him to put it in as a suggestion, to which the plaintiff replied that he did not consider it as a suggestion and that he was not going to put it in until he knew what he was going to get for it. This was not denied by Chatterton.

At about the same time that the plaintiff brought in his models, another employee of the defendant, a Mr. Chandler, also brought in a sketch for a proposed improvement in car seat bases, and a model he had made in the shops of the defendant. These models were later shown to Mr. Cornwall, the manager of the defendant company. He was impressed with the models of both the plaintiff and Chandler, and ordered full-sized bases to be made up according to the respective models and plans of both Chandler and the plaintiff. He testified: "The reason I had the two bases made up was because I wanted to decide in my own mind which was the better."

He evidently expected at this time that the invention which was decided to be most adapted to the use of the company would become its property. In any event, it is clear that his reason for having models made up was not to develop further the principles involved in either the Chandler or the plaintiff's model, but to determine for himself which was the better. There was no difficulty in understanding the principle on which the plaintiff's models were based.

The defendant contends that the plaintiff never notified it that he wanted to sell his invention to the defendant until the defendant had spent a large sum of money in developing it and reducing it to practical use. The District Court, however, found that the expenditures were made for the defendant's own purposes, not for the purpose of assisting the plaintiff; that "the plaintiff did not request that the defendant make models for his use and benefit. He merely permitted it and lent his assistance in order that those in authority in the defendant company, who believed the invention would meet their requirements, might be certain of it." Massie v. Fruit Growers' Express Co. (D.C.) 31 F.(2d) 463, 466.

The record discloses that the first metal base made up by the company was made up largely from parts it had on hand. It developed some trouble in "sticking" and did not reverse in perfect alignment. The plaintiff said this was due to imperfect machine work. To correct any trouble of this nature he made a change by advancing the center line one-eighth of an inch off center, which it is claimed remedied the defect. The plaintiff, however, testified that this was not necessary to the successful working of his invention; that his invention was perfect without it and it was not made a part of his application for a patent, and that the defendant afterward made and sold bases made in accordance with his wooden model, which the defendant did not deny. The second base made up, however, had this change in the center line, and a third and perhaps a fourth base was made up, using different material for the base. It appears that the defendant did not "tool up" for making a base according to the plaintiff's invention until it had satisfied itself that the plaintiff's invention was satisfactory and the better adapted to meet demands of the railroads as compared to the Chandler base. It then made up additional samples to show to the railroads. Before any sales were made, however, the plaintiff was discharged.

The cases cited to the effect that an invention must be reduced to actual practice before it is complete as a patentable invention and therefore the work of the defendant in proving that the plaintiff's idea was practical by building full-sized models was essential to the completion of the invention, are all cases involving interference and priority. Smith v. Warnock, 50 App.D.C. 326, 271 F. 556, 558; James v. Stimson (Cust. & Pat.App.) 49 F.(2d) 493, 496; Automatic Weighing Machine Co. v. Pneumatic Scale Corp. (C.C.A.) 166 F. 288, 298; T. H. Symington Co. v. National Malleable Castings Co. et al., 250 U.S. 383, 386, 39 S.Ct. 542, 63 L.Ed. 1045; Corley v. Robinson (D.C.) 3 F.Supp. 176, 178; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 387, 72 L.Ed. 610; Seymour v. Osborne, 11 Wall.

516, 552, 20 L.Ed. 33. Also see Walker on Patents (6th Ed.) Sec. 109, pp. 134, 135, Sec. 160, p. 187; National Cash-Register Co. et al. v. Lamson Consolidated Store-Service Co. (C.C.) 60 F. 603; Conway et al. v. White (C.C.A.) 9 F.(2d) 863, 868.

In the case of Automatic Weighing Machine Co. v. Pneumatic Scale Corp., supra, the court said, at page 292 of 166 F.:

"When two patents for the same invention have been issued to independent inventors, we understand the rule to be that the dates of their respective inventions are, first, the dates of the patents; second, the dates of the applications, provided the application sufficiently describes the invention; third, the dates of actual reduction to practice; fourth, the dates of conception; with this qualification, that, if either patentee seeks to carry the date of his invention back to the date of his conception, he must show reasonable diligence in adapting and perfecting his invention, either by actual reduction to practice *or by filing his application.*" (Italics supplied.)

■ Where, however, the inventor applies for and obtains a patent on his own draft and application, his invention, if patentable, is considered complete where no interference or prior right is claimed, especially if one skilled in the art can from his draft and description in the application make the device, as it apparently was done in this case, since the defendant made up and sold car seat bases built according to the plaintiff's so-called cardboard and "cigar box model."

■ It cannot be said that the District Judge was clearly wrong in finding: "From the moment when the idea was originally submitted to the defendant, there seems to have been very little doubt as to its successful use. As stated by one of the defendant's officials, 'It was complete enough so that you could see it was going to meet the requirements.' A minor change suggested by the defendant [plaintiff], temporarily adopted, was abandoned as useless." 13 F.Supp. 825, 830.

■ If the plaintiff on bringing in his model notified his superior, Eichel, and the plant engineer, Chatterton, neither of whom denied it, that he would not put his plan in as a suggestion until he knew how much he was going to get for it, and if Mr. Cornwall, the manager, in his talk with the plaintiff in December, 1928, got no response to his suggestion that the plaintiff put his plan in as a "suggestion," and if again in March, 1929, he refused to put it in as a "suggestion" at the request of Mr. Chatterton, and during April, 1929, he told Mr. Steele, who was manager of one of the defendant's plants, that he would not accept an offer of $750 for his invention, but wanted $10,000, and again in April, 1929, he was also asked by Mr. Cornwall how much he wanted for it, we think the District Judge was warranted in finding, or at least his findings cannot be said to be clearly wrong, that the defendant knew that the plaintiff had refused to put his invention in as a "suggestion," or to turn it over to the defendant until he knew what he was going to get for it.

When, however, the officials of the defendant company had satisfied themselves that his invention was practical and solved their problem, they made every effort to secure an assignment of his patent, and, failing in that, sought to claim an absolute "shop right." He was in March, 1929, or the early part of April, presented with an application for a patent and an assignment to the defendant, and, upon his refusal to agree, he was brought into the office of a firm of patent lawyers in Boston, where a lawyer explained the law with reference to "shop rights." It is claimed that the testimony of Mr. Cornwall and Mr. Steele discloses that he admitted that the company had a "shop right." It appears that neither Mr. Cornwall nor Mr. Steele nor the plaintiff knew what constituted a "shop right" until the lawyer explained the law.

Cornwall testified that after the lawyer carefully and clearly explained to the plaintiff what constituted "shop rights," the lawyer said to the plaintiff: "You concede that the company has a shop right?" and the plaintiff agreed that they had; but Cornwall added that the plaintiff further said: "They are not going to get this for nothing," although that is exactly what the admission of the plaintiff, if binding, would do. However, Cornwall further testified: "When I say that he conceded that the company had a shop right, I think his words were 'They made up the models' or something to that effect." There is no dispute about the fact that models were made up at the defendant's plant; but, as the District Court found, they were not made for the plaintiff's benefit or at his request.

Cornwall admitted that he had previously told an associate of the patent lawyer "that the castings and the work was done in our machine shop; that the material

was furnished by the company and that he was in the employ of the company at the time he made those models," which might well have been sufficient to warrant a conclusion by the patent lawyer that the defendant had a "shop right."

A careful examination of the record shows that neither Cornwall nor Steele were positive of their recollection of the conversation that took place at the office of the patent lawyer, or the form of the alleged admission. Steele's testimony was found even less definite than that of Cornwall. He testified that the lawyer said, after the plaintiff refused to assign the patent, that the defendant had "shop rights," *"and my recollection is* that Mr. Small agreed to that point. * * * Specifically he (the plaintiff) did not to my knowledge deny that the Heywood-Wakefield Company had a shop right in this invention."

The plaintiff, however, denied that he ever admitted that the defendant had a shop right in his invention, but merely admitted that full-sized models were made up in the defendant's shop.

As to the weight to be given to the testimony of Cornwall and Steele, Steele stated that he had brought the plaintiff into the patent lawyer's office at the suggestion of Mr. Cornwall, although Mr. Cornwall denied that it was at his suggestion. Steele also testified that he discharged the plaintiff because he was not giving his entire time to his work and at the suggestion of Eichel that his work was not satisfactory; Eichel, however, testified that the plaintiff's work was always satisfactory and that he made no suggestion that he be discharged. Steele also admitted that in an interview with the plaintiff's lawyer he had previously said he could not say under oath that the plaintiff admitted a "shop right" at this interview; but after talking with other people his recollection was changed in the matter, so that he now remembers the admission; although his recollection was still vague as to what occurred in the lawyer's office.

While the District Judge found "with some hesitation" that the plaintiff had expressed the view at the conference in the lawyer's office that the defendant had a "shop right," under the circumstances,—in the light of all the testimony outlined above—the District Judge did not regard it as very helpful upon this issue. An admission, if one was made, is not necessarily conclusive, but must be weighed in the light of the circumstances and other evidence in the case. To be conclusive an admission must be made with full knowledge of all the facts and their significance.

The plaintiff, before he left the defendant's employ, had repeatedly refused to assign his patent or put it in as a "suggestion," or to enter into any arrangements giving the defendant rights therein, until he knew what he was going to get for it, and so stated at the conference in the office of the patent lawyer. The record does not sustain the defendant's contention that it was entitled to a "shop right" as a matter of law. The District Judge found that the question was one of fact, and we think the record and the findings of the District Judge sustain his conclusion "that the plaintiff conferred no shop right upon the defendant."

The decree of the District Court is affirmed, with costs.

MORTON, Circuit Judge (dissenting).

I agree that the defendant was not entitled to an assignment of the patent; but it seems to me that he was entitled to a shop right. The essential facts are not in dispute. After having conceived his invention of a base for a rotating car seat, Small made a miniature wooden model of it. It was of crude construction but embodied the principle on which the base worked. He did this work at home out of business hours. He showed the model to his immediate superiors in the factory; and it was also shown to persons higher in authority. By their orders working drawings and patterns were made and a full-sized seat was constructed at an expense to the defendant, so it is said, of about $7,400. A number of different workmen were employed on this work, to some extent under Small's direction. But it does not appear that he was relieved of his duties as checker in order to supervise it. During this period Small was requested by his superiors in the factory to offer his invention to the defendant as a "suggestion." The defendant had a system under which workmen were encouraged to make suggestions for improving its practice or product and were given bonuses for suggestions which were considered valuable. Small declined to put in his invention on this footing.

After the commercial base was completed, the defendant had its patent solicitor prepare an application for a patent covering it. This application was made in

Small's name, and was accompanied by an assignment to the defendant. Small was asked to sign these papers and refused to do so. About three weeks later he was discharged from his employment.

The District Judge found, "The plaintiff did not request that the defendant make models for his use and benefit. He merely permitted it and lent his assistance in order that those in authority in the defendant company, who believed the invention would meet their requirements, might be certain of it. This work was done for the defendant's benefit, by its volition and with a view to the acquisition, not of a shop right, but of the invention itself. Nor did the plaintiff permit the defendant to make, use, and sell these devices without compensation. His whole course of dealing as disclosed to the defendant indicated that he regarded the invention as his own and would afford the defendant no rights under it unless and until they should make a satisfactory agreement in regard to compensation. If there are circumstances under which, notwithstanding the foregoing facts, a shop right is to be inferred, this does not seem to me to be such a case." The reasons on which this last ruling rests are not stated. The District Judge further found that at the interview in the office of the defendant's patent solicitor, "after Mr. May had explained to the plaintiff the legal basis of a shop right, the plaintiff expressed the view that the defendant had one." 13 F.Supp. 825, 832.

A shop right is a license from the patentee to his employer resting, either on a contract implied in fact from the relations between them and assistance furnished by the employer in developing the invention, or on an estoppel based on conduct by the inventor-employee which makes it clearly inequitable that he should be permitted to insist, as against his employer, on the exclusive rights granted him by the patent. In this latter aspect, "The principle is really an application or outgrowth of the law of estoppel in pais, by which a person looking on and assenting to that which he has power to prevent is held to be precluded ever afterwards from maintaining an action for damages." Brown, J., Gill v. United States, 160 U.S. 426, 430, 16 S.Ct. 322, 324, 40 L.Ed. 480. Each case depends on its own facts, and the decisions shade into each other. In Burton v. Burton Stock-Car Co., 171 Mass. 437, 50 N.E. 1029, the circumstances were held to show an implied license upon payment of a reasonable royalty. In McClurg v. Kingsland, 1 How. 202, 11 L.Ed. 102, it was held that the facts justified the presumption of absolute license. In Keyes v. Eureka Mining Co., 158 U.S. 150, 15 S.Ct. 772, 39 L.Ed. 929, it was held that there was an implied license to use the invention without payment of royalties during the continuance of the inventor in the defendant's employment, and also a license to use it upon the same terms and royalties fixed for other parties from the date when the patentee left the defendant's employment. These decisions illustrate how flexible the law is on this point, and how free the courts have felt to work out a just result.

In the present case the need for an improvement in bases for car seats and the defects in existing seats were called to the plaintiff's attention in connection with his employment and led him to apply his mind to the question. He submitted his invention to the defendant in a very crude form. The principle was there; but from the whittled-out wooden model which the plaintiff showed the defendant to a completed base suitable for use in a railroad car was a long way, beset with many practical problems of manufacture which remained to be solved and which were certain to involve and did involve substantial expense. My brethren make no account of these difficulties; they assume that when invention is complete the thing is ready for the market. This is rarely if ever true and was not true in this case. The difficulties and expense involved in putting an invention into commercial form, when met by the inventor's employer, are one of the recognized reasons for shop right. Cases supra.

In this case Small permitted the defendant to go ahead and develop the crude model of his invention into a practical base. This work was done by the defendant's workmen in its factory at its expense, and with no cost to Small. He was kept on his old duties at his regular salary. A good deal of the work was of kinds in which he was not skilled. He supervised it and made suggestions. I can see no substantial difference between the present case and one in which the inventor was taken off his regular work by the employer and assigned the task of completing his invention, the employer paying him for his time in so doing—which is the typical case of shop right. The expenditure by the employer on the employee's invention is not, as both parties understand in absence of evidence to the contrary, intended as a gift to the

employee. The inventor understands that he is to compensate his employer in some way for the expenditure on the invention. The only question is what form that compensation was expected to take. When there is an express agreement on the point it controls. When there is not the courts imply one for compensation in the form of a shop right, either unrestricted, or limited as justice may require. Cases supra.

Here the defendant, at the time when it developed the plaintiff's invention, did so on the claim that the invention was its property, and that the patent, if one should be granted, would belong to it. The plaintiff disputed this from the start, and the defendant knew of the dispute. But both parties joined in the work of developing the invention. In Lane & Bodley Co. v. Locke, 150 U.S. 193, 14 S.Ct. 78, 81, 37 L.Ed. 1049, the employee-inventor notified the defendant of his rights but did not press them as long as he remained in the defendant's employment. He gave as a reason for his failure to do so, "I had neither the time nor the means at my command to enforce my rights in case of the refusal to comply with their agreement at that time." It was held that he stated no case for relief in equity. In Burton v. Burton Stock-Car Co., supra, on facts not so strong for the defendant as those here, it was held that there was a shop right. There is no evidence that the parties went ahead with the development work on the understanding that it would be a gift to the plaintiff if he should establish his right to the invention.

What seems to me to be the correct view of the matter is that both parties, by tacit agreement between them, joined in the development work on the invention, which in any event had to be done before it could be a commercial success, looking to a proper adjustment between them when their respective rights in the patent (if one were granted) should be finally determined. This view is strongly supported by the plaintiff's assent to Mr. May's statement that the defendant did have a shop right under any patent which might be issued to him. I think Small must have understood that, if the ownership of the patent should eventually come to him he was bound to compensate the defendant in a reasonable way for the expense which it had been to in developing his invention. An out-and-out shop right, i. e., an unconditional license for the life of the patent, greatly impairs the value of a patent. It makes it impossible for the patentee to control the market for the invention and protect his other licenses from open competition. In view of Small's explicit reservation of rights such a shop right would go beyond what the defendant is entitled to. On the other hand, Small's assent to Mr. May's statement shows that he recognized an obligation to the defendant in the matter. In these cases the courts have power to decree what appears to them to be an equitable arrangement between the parties. Cases supra. The just result, as it seems to me, is that the defendant should have a license under the patent on as favorable terms as granted to any licensee and that a certain proportion, perhaps one-half, of the amount expended by the defendant in the development work on the patent be allowed the defendant as a credit on such royalties as might become due under the license.