Heckett Engineering Inc. v. Commissioner.
Heckett Eng'g Inc. v. Commissioner
Docket No. 11487.
United States Tax Court
1947 Tax Ct. Memo LEXIS 13; 6 T.C.M. (CCH) 1305; T.C.M. (RIA) 47337; December 23, 1947
*13 Sidney B. Gambill, Esq., 747 Union Trust Bldg., Pittsburgh, Pa., for the petitioner. Stanley W. Herzfeld, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner seeks a redetermination of deficiencies of $189.25, $35,214.35, and $29,015.39 in excess-profits tax for the years 1941, 1942, and 1943, respectively. The issues involved are whether petitioner is entitled to deduct for royalties paid E. H. Heckett for the use of certain patents in 1942 and 1943, and, if so, the amount of the deduction; and the reasonable amounts of compensation for services to be paid to certain officers and employees of petitioner. Findings of Fact Petitioner and Holland Engineering Company were incorporated in the State of Ohio on August 10, 1940, and April 26, 1939, respectively. The Heckett Corporation was incorporated in the State of Pennsylvania, on May 5, 1941. These corporations were engaged in the business of recovering scrap metal from slag. A schedule showing stock ownership of petitioner from November 9, 1940, to date is as follows: No. of
Total Shares
Common Stock No Par Value
Authorized
Shares Issued
Issued
Nov. 9, 1940 (Original Issue)
300
Greta S. Heckett
34
E. H. Heckett
124
G. F. Hammond
1
Pauline Feibus
1
126
Philip W. Frieder
15
Freda Frieder
50
225
December 5, 1941
300
Greta S. Heckett
30
E. H. Heckett
98
G. F. Hammond
1
Pauline Feibus
1
100
Philip W. Frieder
10
Freda Frieder
50
Leonard J. Buck
35
225
December 19, 1941
500
Greta S. Heckett
30
E. H. Heckett
98
G. F. Hammond
1
Pauline Feibus
1
100
Philip W. Frieder
10
Freda Frieder
50
Leonard J. Buck
60
250
March 25, 1942
500
Greta S. Heckett
60
E. H. Heckett
198
G. F. Hammond
1
Pauline Feibus
1
200
Philip W. Frieder
60
Freda Frieder
60
Leonard J. Buck
120
500
June 2, 1945
500
Greta S. Heckett
60
E. H. Heckett
198
G. S. Hammond
1
Pauline Feibus
1
200
Freda Frieder
120
Leonard J. Buck
120
500
*14 A special meeting of the directors of Holland was held on December 1, 1941, for the purpose of dissolving that corporation because of the difficulties occasioned by the fact that the owner of 24 percent of its stock was a foreign national, subject to restrictions. A motion duly adopted at that meeting stated: "WHEREAS, the patent for the process used by the Holland Engineering Company is carried on the books of the company at $1.00; and "WHEREAS, the Holland Engineering Company has secured only the right to the use of the process when and if patented, but is not entitled to the patent itself, even though it is carried on the books of the company at $1.00; and "WHEREAS, E. H. Heckett made application for a patent of the process used by the Holland Engineering Company, while he was employed by the Holland Engineering Company, but that the patent was also secured while he was employed by the Heckett Engineering, Inc. and The Heckett Corporation, and that it has always been understood and agreed between the said E. H. Heckett and the Holland Engineering Company that the Holland Engineering Company should have only the right to the free use of any patent processes that were obtained *15 by the said E. H. Heckett while in its employ; THEREFORE "BE IT RESOLVED, that these facts be called to the attention of any person or persons who appraises the assets of the Holland Engineering Company in its contemplated sale to the Heckett Engineering, Inc. and that the patent secured by the said E. H. Heckett shall be valued among the assets of the Holland Engineering Company at $1.00 the amount that the same is carried on the books of the company, and that the said Holland Engineering Company hereby releases the said E. H. Heckett from all rights which it has in and to said patents, save and except that the said Holland Engineering Company shall not be charged for the use of said patent process during its existence as a corporation; "BE IT FURTHER RESOLVED, that the payment by the Holland Engineering Company for certain expenses connected with the obtaining and use of patents sought by E. H. Heckett during said period of his employment, be considered as full and complete compensation for the use of the patent by the Holland Engineering Company during its existence as a corporation." At a directors' meeting of Holland Engineering Company on January 20, 1942, E. H. Heckett, *16 its president, or G. F. Hammond, its vice-president, was "* * * authorized and directed to execute a Bill of Sale, Assignment, and any and all other instruments of conveyance necessary to transfer, assign or convey all of the assets of the Holland Engineering Company to the Heckett Engineering, Inc., an Ohio corporation, including such physical assets as are now located at the plant of the Republic Steel Corporation at South Chicago, Illinois, and that the title to said assets shall pass to the Heckett Engineering, Inc. as of January 1st, 1942." It was also resolved that petitioner would assume all of Holland's indebtedness and complete all of Holland's contracts; that petitioner gave Holland its note for $42,355.12 as the purchase price of Holland's assets. Pursuant to this resolution, a bill of sale from Holland to petitioner was executed by G. F. Hammond, Holland's vice-president. Specifically included among the assets transferred was its stock in trade, fixtures, machinery, equipment, and property, and - "* * * the right to use all processes, machinery and equipment protected and covered by a patent secured November 25th, 1941, by E. H. Heckett, known as No. 226424, filed *17 September 9th, 1939, being the method and apparatus for reclaiming metal, together with the right to use the method and apparatus for reclaiming metal, which may hereafter be secured by E. H. Heckett, now applied for or which may hereafter be applied for." When petitioner received its assets early in 1942 from the Holland Company there was included, at no value, a contract between Holland and E. H. Heckett, who was the owner of 52 percent of the stock of both corporations, giving Holland, "its successors and assigns," the right to the use of machinery, equipment, and processes protected by patents held by E. H. Heckett, and any amendments and improvements thereon, all for the nominal consideration of $1.00 and "other good and valuable consideration." This contract was made when E. H. Heckett was in a poor bargaining position and obliged to make concessions in order to induce his backers to assist him. On July 1, 1939, Holland had contracted with the Republic Steel Corporation for scrap recovery operations by Holland at Republic's South Chicago Plant. Holland engaged in this scrap recovery operation in 1939, 1940, and 1941, and January, 1942, at which time petitioner took over the *18 South Chicago operation. In carrying out the South Chicago operation, petitioner used machinery and processes covered by the Heckett patent. In a meeting of petitioner's board of directors held on January 26, 1942, it was pointed out by G. F. Hammond, vicepresident of petitioner at that time, that Heckett had not, as yet, executed an agreement giving petitioner the right to use the processes, equipment, and machinery protected by the Heckett patent No. 2,264,204, together with amendments thereto. A motion was made and carried that Hammond be authorized to enter into a contract with Heckett for the use of the patents and processes "for the consideration of $1.00 and upon which such other terms and conditions as to him seems for the best interests of the corporation." Hammond and Heckett were asked by the board of directors to try and find a fair basis for royalty payments, and to contact other industries and inventors in an attempt to find a basis that was generally in use. They contacted different patent lawyers and other firms that were dealing with royalties in order to determine a fair basis. This led to an agreement by the board of directors on April 7, 1942, with respect to *19 the payment of royalties to Heckett. This agreement was entered in petitioner's minutes and provided that petitioner should have the use of the Heckett patents during the life of such patents in consideration of payment by petitioner to Heckett of royalties computed as follows: For the first $100,000 worth of scrap re-
covered
$1.00
For the second $100,000 worth of scrap
recovered
5%
For all scrap recovered in excess of the
value of $200,000
10%
Sometime between April 7, 1942, and July 9, 1942, it was called to the attention of Heckett and petitioner that the Wheeling Steel Corporation of Wheeling, West Virginia, was building a separator for reclaiming metal from scrap. Petitioner and Heckett negotiated with the Wheeling Steel Corporation in an attempt to get them to refrain from building such a machine. This Wheeling refused to do, and it was decided at that time that steps would be taken to defend the Heckett patents and, if necessary, to sue the Wheeling Steel Corporation for infringement. Heckett did not have sufficient money at that time to finance such proceedings, and this gave rise to an agreement between Heckett and petitioner on July 9, 1942, as *20 follows: "BE IT RESOLVED, that the resolution passed by the Board of Directors of this company at a meeting of the Board of Directors held on April 7, 1942, allowing E. H. Heckett compensation for the use of patents secured by him be, and the same is hereby revoked and held for naught; "BE IT FURTHER RESOLVED, that this company be, and is hereby authorized to use all patents secured by E. H. Heckett, on any and all amendments thereto, for the reclamation of scrap and metallic products during the life of the patents in the United States and its Possessions; "BE IT FURTHER RESOLVED, that the consideration for the use of said patents, and any amendments thereto, shall be the cost for obtaining said patents, which has been expended by E. H. Heckett, plus any and all costs and expenses which may be incurred by E. H. Heckett to protect him and/or this company from infringements upon the right to use said patents, and any and all costs and expenses that may be incurred by him in maintaining the patents in full force and effect during the life of said patents." Immediately after the resolution of July 9, 1942, Wheeling Steel Corporation decided that they would not use the machine in *21 the process of construction except "for straightening out some blast furnace slag" and the matter of the infringement suit against Wheeling was dropped. It was decided, on the part of petitioner and Heckett, that if anyone, during the war period, violated the patents or infringed the patents, they would not sue for infringement inasmuch as such a suit would hold up scrap recovery during the war. Immediately after the decision not to sue Wheeling for infringement, another royalty agreement was made. It was decided by Heckett and petitioner to go back to a royalty agreement and to put the cost of protecting the patents on Heckett's shoulders again. By that time the business had grown considerably and it was felt that the amount stipulated in the first royalty agreement of April 7, 1942, was too high, considering the increased volume of production during the war. An oral agreement was reached on August 1, 1942, to the effect that Heckett would receive, for the use of the patents, a royalty at the rate of fifteen cents per ton of scrap recovered. This oral agreement was not formally acted upon by the board of directors until January 28, 1943. At that meeting Hammond, vicepresident of petitioner, *22 was authorized to enter into a contract with Heckett transferring to petitioner the right to the use of the processes and machinery covered by the Heckett patents, in consideration of the payment to Heckett of fifteen cents per ton of all scrap recovered from and after the first day of January, 1942. Thereupon, and pursuant to this resolution, Heckett was paid the sum of $13,142.85, representing royalties with respect to the 1942 production, and $5,537.25, representing royalties with respect to the 1943 production. These royalties were computed at the rate of fifteen cents per ton on each ton of scrap produced during those years. On February 1, 1945, a contract was entered into between Heckett and Brown Brothers wherein the latter agreed to pay The Heckett Corporation fifty cents per gross ton for all scrap recovered by Brown Brothers at the Lukens Steel Company plant at Coatesville, Pennsylvania, by the use of the Heckett patents. Later, on April 16, 1945, another contract was entered into between Heckett and Brown Brothers wherein the latter agreed to pay The Heckett Corporation for the use of the Heckett patents, forty cents per gross ton of Class A material recovered, thirty *23 cents per gross ton of Class B material recovered, ten cents per gross ton for Class C material recovered and five per cent of the net proceeds for Class D material recovered by Brown Brothers at the Phoenix Iron Company plant, at Phoenixville. The foregoing rates were at first paid directly to The Heckett Corporation, which in turn paid to Heckett fifteen cents per ton of scrap recovered at the two plants. Later, the arrangements were changed and Brown Brothers thereafter paid the full amounts of the royalties specified in the two contracts directly to Heckett. In a letter to Carnegie-Illinois Steel Corporation on behalf of The Heckett Corporation, dated December 4, 1941, it was stated that they were in the process of licensing a number of organizations under their method, giving them the right of operation under their patents and in some cases engineering assistance. By far the greater part of the machinery and equipment used by petitioner, Holland, and The Heckett Corporation, in their operations was not covered by the Heckett patent. The major part of such equipment, consisting of such items as cranes, bulldozer, lifting magnets, car puller, steam shovel and trucks, was used *24 by other contractors doing similar work. Among them were Robert Chambers and Morris Horn, doing business as Pitt Iron Company, and hereafter again referred to. The machinery, not protected by the Heckett patents, used in these operations, can separate large quantities of scrap metal from slag, in condition acceptable to the steel companies. Steel companies were interested in selecting contractors for the recovery of scrap metal from slag, who would extract as much of the metal in the slag as possible so that material would not be wasted, and who would recover material of a sufficiently high metallic content so that there would be no difficulty in the furnace. Carnegie-Illinois Steel Corporation solicited bids for scrap salvage at its slag and refuse dumps by circulating a list of specifications dated November 12, 1941. Among the bidders were Robert Chambers and The Heckett Corporation. By letters to Carnegie-Illinois Steel dated November 27, 1941, and December 4, 1941, The Heckett Corporation gave a brief statement of the processes covered by the Heckett patents and methods of operation. Among the representatives of Carnegie-Illinois Steel Corporation who had inspected the *25 Heckett processes before November 27, 1941, was the superintendent of Carnegie-Illinois Steel Corporation's South Chicago plant. Heckett's bid promised a lower metallic content than Chambers' bid. Chambers fulfilled his promise as to the metallic content and performed in accordance with the specifications of Carnegie-Illinois Steel Corporation. The Heckett patent promised greater quantities of metal. Chambers did not agree to deliver any specific quantity of scrap. To deliver a small amount of scrap having a high metallic content from slag dumps is a simple, inexpensive but wasteful process. None of the jobs for which bids were solicited by Carnegie-Illinois Steel Corporation were awarded to The Heckett Corporation or petitioner. Chambers was the successful bidder for an operation at Gascola. He operated the Gascola dump of Carnegie-Illinois Steel Corporation for seven years on a year-to-year contract. Heckett had a letter of introduction to Frieder in 1939. Frieder was one of the largest scrap brokers in the United States and was closely allied with the steel industry. He was instrumental in getting the first contract for the Holland Engineering Company. He took an interest *26 in the business of Holland and petitioner and advised in all steps which were taken. He was able to obtain entree so that Heckett became acquainted with the men connected with every steel plant in the United States. He advised Heckett constantly and helped during the war. He assisisted in obtaining machinery and in making new contracts and adjusting old contracts. He attended directors' and stockholders' meetings of petitioner and was called upon often during the years. Negotiations with the Republic Steel Corporation began on February 23, 1939, and when E. H. Heckett encountered difficulties in these negotiations Frieder facilitated the execution of the first contracts. Buck also provided Heckett with introductions to men at leading steel mills, and in 1939 arranged an elaborate itinerary for Heckett to visit the mills. He had constantly advised Heckett in the steps taken by Holland Engineering Company and petitioner. He also assisted in overcoming war complications. Buck was helpful in securing government financing amounting to $1,250,000 for The Heckett Corporation. Buck and Frieder assisted in securing contracts which The Heckett Corporation had with the steel companies. *27 An agreement between Holland and Republic Steel Corporation for scrap at the Gadsden, Alabama, plant was entered into on May 31, 1940. It was decided to organize Holland Engineering Company only after it became clear that contracts from Republic Steel Corporation could be obtained. The major part of petitioner's income during 1941, 1942, and 1943 was derived from operations previously carried on by Holland Engineering Company. The gross sales, net income per return, and salaries of Heckett, Frieder, and Buck for the years indicated were as follows: 1941
Fiscal year ending
The Holland
4/30/42
Engineering
The Heckett
Company
Petitioner
Corporation
Gross Sales
$111,909.13
$214,955.89
$ 78,184.74
Net income per return
15,530.93
21,587.11
(25,778.31)
Salary of E. H. Heckett
10,137.50
25,660.00
2,000.00
Salary of P. W. Frieder
6,000.00
None
Salary of Leonard Buck
2,179.07
None
Fiscal year ending
1942
4/30/43
Gross Sales
$738,664.50
$545,277.49
Net income per return
90,605.59
(3,855.92)
Salary of E. H. Heckett
41,390.78
8,000.00
Salary of P. W. Frieder
10,000.00
None
Salary of Leonard Buck
12,000.00
None
Fiscal year ending
1943
4/30/44
Gross Sales
$293,757.75
$1,162,025.52
Net income per return
24,525.56
914.78
Salary of E. H. Heckett
24,000.00
16,000.00
Salary of P. W. Frieder
12,000.00
None
Salary of Leonard Buck
12,000.00
None
*28 In 1939 Heckett visited steel plants throughout the country in an effort to negotiate contracts with them. He also worked on the patent application, and with machinery manufacturers to build machines for the scrap recovery business. He directed the construction and installation of the machines. He managed the entire operation, except invoicing and bookkeeping, from an office in his residence. He incurred telephone, telegraph, and traveling expenses; and employed secretarial help for $75 to $90 per month. All of these costs were borne by him without charge to the corporation. In the beginning Heckett worked in the plants supervising and operating them and training personnel. He worked long hours. In the years 1939 and 1940 Heckett drew no compensation or reimbursement for expenses from Holland. In 1940 Holland's sales were $74,198.30 and its net income was $3,312.43. In 1941 Heckett divided his time between Holland Engineering Company, The Heckett Corporation, and petitioner. In 1942 and 1943 he divided his time between petitioner and The Heckett Corporation. The returns for The Heckett Corporation for the periods indicated disclose, with reference to the time devoted by and *29 money paid to E. H. Heckett, the following: May 1, 1941, to April 30, 1942
"All"
$ 2,000
May 1, 1942, to April 30, 1943
"All"
$ 8,000
May 1, 1943, to April 30, 1944
"All"
$16,000
The returns for petitioner for the periods indicated disclose, with reference to the time devoted by and money paid to E. H. Heckett, the following: 1941
"1/2"
$25,660.00
1942
(Does not answer question)
1943
"50%"
$24,000.00
Buck's 1942 Federal income tax return reported income from the following sources: Leonard J. Buck, Inc.
$100,000.00
Sussex Trading Corp.
25,000.00
Bulk Cargo Operating Co., Inc.
6,720.00
Heckett Engineering, Inc.
9,000.00
$140,720.00
In addition, in 1942 Buck reported profit of $184,735.43 from an operation as special representative in Brazil of the Metals Reserve Corporation. Buck's 1943 return reports income from the following sources: Leonard J. Buck, Inc.
$100,000.00
Sussex Trading Corp.
25,000.00
Bulk Cargo Operating Co., Inc.
1,369.77
Heckett Engineering, Inc.
12,000.00
Directors' fees
50.00
Metals Reserve Corp. Commissions
21,003.87
$159,423.64
The returns of *30 Leonard J. Buck, Inc., report that in 1941, 1942, and 1943, Buck devoted all of his time as an officer of that corporation. The return of Sussex Trading Corporation for the year 1941 reports that Buck devoted "part" of his time as an officer of that corporation and its returns for 1942 and 1943 report that Buck devoted "all" of his time in each of those years as an officer of that corporation. Frieder's return for 1942 shows total compensation of $47,200, comprised of $36,000 from the Philip W. Frieder Company, $10,000 from petitioner, and $1,200 directors' fees from the Youngstown Steel Tank Company. His return for 1943 shows that he received $33,900 from the Philip W. Frieder Company, $12,000 from petitioner, $1,348.80 from Youngstown Steel Tank Company, and $833.33 ($1,500 exemption) from the United States Army. The return of the Philip W. Frieder Company for 1941 reports that petitioner devoted "all" of his time to the business of that company. Its return for 1942 reports that he so devoted 90 percent of his time, and for 1943, that he so devoted 50 percent of his time. The Philip W. Frieder Company received the following amounts from petitioner: 1941
$ 2,248.20
1942
13,255.47
1943
2,299.73
*31 The Philip W. Frieder Company also received the following amounts from Holland Engineering Company: 1939
$ 39.20
1940
2,267.70
1941
1,910.40
1942
84.30
Frieder owned 246 shares out of the 250 outstanding shares of the common stock of the Philip Frieder Company in 1941, 1942, and 1943. W. K. Jones, on April 26, 1947, the date of the hearing, was 30 years old. He was a graduate of Ohio State University, had been employed in public accounting by Haskins & Sells in New York, with Ernst & Ernst in Cleveland, and with Clark & Collins in Youngstown. The last employment with Clark & Collins was as a senior accountant, assigned to work on Heckett audits and taxes. He left Clark & Collins June 30, 1941, to join the Heckett interests and has since been in complete charge of its books and records. His compensation as of April 26, 1947, from Heckett was at the rate of approximately $20,000 per year. E. H. Heckett's compensation, paid by petitioner, was computed pursuant to directors' resolutions adopted on December 21, 1940, February 10, 1941, and July 1, 1941. The resolution of December 21, 1940, provided that Heckett was to receive all of the profits of the company *32 up to and including $6,000, 10 per cent of all the net profits of the company from $6,000 to $16,000, 15 per cent of all the net profits from $16,000 to $26,000, 17 1/2 per cent of all net profits from $26,000 to $36,000, and 20 per cent of all net profits over $36,000. By resolution of petitioner's directors adopted February 10, 1941, E. H. Heckett's salary was fixed at $250 per month beginning February 1, 1941, in addition to the compensation on a percentage basis provided by the resolution adopted December 21, 1940. E. H. Heckett was also voted an additional $250 per month beginning February 1, 1941, to be used as expenses for the benefit of the company. On July 1, 1941, petitioner's directors adopted a resolution to pay E. H. Heckett $8,000, in addition to the salary fixed by resolution of February 10, 1941, as payment for additional services from January 1, 1941, to July 1, 1941. This payment was in addition to the percentage of profits allowed E. H. Heckett by the directors' resolution dated December 21, 1940. It was further voted that beginning July 1, 1941, E. H. Heckett receive a monthly salary at $1,250 per month, such fixed salary to be in addition to the percentage *33 of profits allowed E. H. Heckett by resolution dated December 21, 1940. In addition to the salary so fixed, it was resolved that E. H. Heckett be allowed the amount of $250 per month as expenses for the benefit of the company. E. H. Heckett's compensation for the period after 1941 was fixed by resolutions of the board of directors of December 1, 1941, and April 14, 1942. By the resolution of December 1, 1941, all contracts of employment with E. H. Heckett were canceled as of December 31, 1941. It was provided that in payment for services beginning January 1, 1942, E. H. Heckett receive all profits of the company up to and including $12,000, no percentage of the net profits over and above $12,000 up to $36,000, and 15 per cent of the net profits over and above $36,000. In addition to the payment for services so provided, it was provided that that the corporation pay E. H. Heckett "$750.00 per month as a determined amount for expenses that may be incurred by him in connection with the operation of the affairs of the company." By resolution adopted April 14, 1942, there was authorized a salary for E. H. Heckett of $1,000 per month beginning March 1, 1942, in addition to the amount *34 provided by the resolution of December 1, 1941. Heckett was born in Germany in 1892 of Dutch nationality. He received a European high school education and attended colleges in Holland, Germany, England, and the United States. He attended Oxford and Columbia Universities, and the University of Berlin. He specialized in chemistry and metallurgy. After leaving college he joined his father's export and import business, where he remained until 1925 or 1926. At about that time he started the business of scrap recovery from steel plants in Europe. This was based upon his patented processes. When he left Europe in 1939 the business had approximately twenty plants in operation in Germany, Holland, Czechoslovakia, Hungary, France and Belgium. Heckett had visited the United States on numerous vacation trips. While he was here in 1938 Hitler invaded Austria, and Heckett realized the desirability of obtaining interests outside of Europe. Through Leonard J. Buck, whose father was an official of the Bethlehem Steel Company, Heckett obtained introductions in Pittsburgh and spent some time there becoming acquainted with the American steel industry. Leonard Buck himself was at that time connected *35 with the steel industry. Part of the difficulty of adapting Heckett's scrap recovery processes to the steel industry in the United States was because of the large differential in wages paid to common labor. At this time the labor cost in Europe averaged around ten cents per hour, while in the United States it was approximately 62 1/2 cents per hour. Notwithstanding the difficulties, Heckett proceeded and obtained the above-mentioned Republic Steel contract. Heckett, by a special act of Congress, became a resident of the United States outside the immigration quota of the Netherlands, and became a naturalized citizen in June of 1945. A patent covering Heckett's method and apparatus for the recovery of steel from open-hearth slag was granted to him by the United States Patent Office on November 25, 1941, and bears No. 2,264,204. On November 24, 1941, Heckett filed an application for an improvement on the earlier patent, and an additional patent was issued to him by the United States Patent Office on July 4, 1944, bearing No. 2,352,712. The advantages said to attach to the Heckett rpocesses and apparatus are a greater and more complete recovery from given quantities of slag and *36 a sizing of the metal to fit the blast furnaces. Petitioner in 1941, 1942, and 1943 had sales and gross profit, respectively, as follows: Year
Sales
Gross Profit
1941
$214,955.89
$100,803.15
1942
738,664.50
239,569.97
1943
293,757.75
157,720.47
For 1941, 1942, and 1943 the stock interests in petitioner, its par value, and dividends paid were as follows: 1941
Shares
Par Value
Dividends Paid
Heckett Interests
130
$13,000.00
$1,300.00
Buck Interests
60
6,000.00
600.00
Frieder Interests
60
6,000.00
600.00
Totals
250
$25,000.00
$2,500.00
1942
Heckett Interests
260
$35,100.00
$3,900.00
Buck Interests
120
16,200.00
1,800.00
Frieder Interests
120
16,200.00
1,800.00
Totals
500
$67,500.00
$7,500.00
1943
Heckett Interests
260
$35,100.00
$2,600.00
Buck Interests
120
16,200.00
1,200.00
Frieder Interests
120
16,200.00
1,200.00
Totals
500
$67,500.00
$5,000.00
In the years 1941, 1942, and 1943, as previously noted, petitioner paid its president, E. H. Heckett, and two of its employees, Leonard J. Buck and Philip W. Frieder, compensation for services rendered by them in those years *37 in the following amounts: E. H.
Leonard J.
Philip W.
Year
Heckett
Buck
Frieder
1941
$25,660.00
$ 2,179.07
$ 6,000.00
1942
41,390.78
12,000.00
10,000.00
1943
24,000.00
12,000.00
12,000.00
Of the total amounts paid E. H. Heckett, Leonard J. Buck, and Philip W. Frieder as compensation for the years 1941, 1942, and 1943 the respondent disallowed the following amounts: E. H.
Leonard J.
Philip W.
Year
Heckett
Buck
Frieder
1941
$4,000.00
1942
4,000.00
$4,000.00
$3,333.33
1943
4,000.00
4,000.00
8,666.67
For the three years involved herein, petitioner's net income, after deducting compensation paid to Heckett, Frieder, and Buck, royalties paid to Heckett, and after Federal income taxes, totaled $67,355.39. This represented a return of more than 125 per cent on the average amount of cash invested in the business by the stockholders. Petitioner's net income for this three-year period after salaries paid, but before Federal income taxes, totaled $136,718.26. This represented a return of more than 250 percent of the average investment of the stockholders in the company. Petitioner's net income after salaries allowed *38 by respondent, but before Federal income taxes for the three years involved, totaled $168,718.26. This would represent a return of more than 300 per cent on the average investment of the stockholders in the company for the three-year period. The reasonable amounts of compensation for Heckett, Buck, and Frieder for 1941, 1942, and 1943, respectively, were as follows: 1941
1942
1943
Heckett
$25,660.00
$37,390.78
$24,000.00
Buck
2,179.07
8,000.00
8,000.00
Frieder
6,000.00
6,666.67
6,000.00
Opinion We have found as a fact that petitioner's assignor was entitled under a contract between it and the inventor to "the right to the use of machinery, equipment, and processes protected by patents held by E. H. Heckett and any amendments and improvements thereon"; and that this contract which protected the assignor's "successors and assigns" was transferrers to petitioner. This is established by petitioner's own recital of the facts as they appear in the formal protest it lodged with respondent. Such being the case, the royalty payments in question, made pursuant to new contracts between petitioner and Heckett, were without consideration and are not *39 deductible as "ordinary and necessary business expenses." Thomas Flexible Coupling Co. v. Commissioner (C.C.A., 3rd Cir.), 158 Fed. (2d) 828, affirming Tax Court memorandum opinion, certiorari denied, 329 U.S. 810. As in that case, the licensor was the majority stockholder of the grantee corporation. Petitioner's suggestion that the license to use the patent was not assignalbe would be sound only if there had been no provision for assignment in the license agreement. "* * * an express license set forth in terms is not assignable unless it is so provided in the instrument." Lane & Bodley Co. v. Locke, 150 U.S. 193, 196. "* * * A mere license to a party, without having his assigns or equivalent words to them, showing that it was meant to be assignable * * * is not transferable by him to another." Troy Iron and Nail Factory v. Corning et al., 55 U.S. 207, 231. Since, however, the present license ran in favor of the licensee's "successors and assigns," it can scarcely be doubted that the assignment was valid. We initiate consideration of the salary issue by reference to the elementary principle that respondent's determination is prima *40 facie correct, and that the burden of proving it otherwise rests upon petitioner. Willis B. Anderson, 6 T.C. 956. Problems of this nature, however, are not simply nor easily solved, and we are justified in turning for assistance to any facts appearing in the record. Dealing first with amounts allowed by respondent for petitioner's principal officer, E. H. Heckett, it at once appears that regardless of sales, gross profit, net income, or services performed, respondent has automatically disallowed $4,000 of salary for each year. We are satisfied from the record that the contribution to petitioner's business made by Heckett in the three years before us was substantially similar. Nevertheless, the effect of respondent's action is to allow $37,390.78 for Heckett's salary in the middle year and not much more than half of this for each of the other two years. While it may be true that the higher sales, gross profit, and net income of the middle year might entitle petitioner to assign a higher amount for Heckett's salary for that year, we cannot overlook the probability that in a continuous operation, such as that conducted by petitioner, the sales and net income for one year *41 may well be based upon services rendered in another, [1] and further, that the quantum and value of services rendered cannot be arbitrarily determined by a mere comparison of sales or income. See In Re Rae's Estate (C.C.A., 3rd Cir.), 147 Fed. (2d) 204. While we are to no extent persuaded that petitioner has carried its burden of showing that the $37,000 figure is too low [2] and hence approve respondent's determination for the middle year, we are convinced htat petitioner has itself adequately recognized the difference in sales and income in the other two years and that a reduction below the figures actually paid by it for these remaining two years if not warranted. The disallowance of salary deductions for Heckett in 1941 and 1943 is accordingly disapproved. As to the other two officers, only the *42 years 1942 and 1943 are in issue. No testimony appears from which we can gather the significant information as to payments for comparable services by comparable employers. See Nathan Cohen v. Secretary of War, 7 T.C. 1002, 1012; L. Schepp Co., 25 B.T.A. 419, 430. In the case of Buck, respondent allowed the same amounts for 1942 and 1943 and there being no adequate evidence to the contrary, his determination must remain undisturbed. The deduction for Frieder's salary for 1942 must likewise be limited to respondent's determination for failure of proof. Amounts allowed for Frieder were in each case less than those allowed Buck and in the last year, 1943, the figure was but half of the amount allowed for the middle year. As in the case of Heckett, services rendered by Frieder appear to be comparable in each of the three years. Since a salary of $6,000 was allowed for Frieder for 1941, a year comparable with, although, if anything, smaller than either of the other two, we think this amount should also be allowed for 1943. Decision will be entered under Rule 50. Footnotes
1. See The Canister Co., 7 T.C. 967, 974; cf. Lucas v. Ox Fibre Brush Co., 281 U.S. 115↩. 2. The mere fact that there existed between petitioner and Heckett a contract calling for compensation based upon a percentage of profits is not by itself sufficient without further evidence of reasonableness. Wood Roadmixer Co., 8 T.C. 247↩.